## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LINET AMERICAS, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.:  1:21-cv-6890 |
| | ) | |
| vs. | ) | |
| | ) | |
| HILL-ROM HOLDINGS, INC.; HILL-ROM | ) | <u>JURY TRIAL DEMANDED</u> |
| COMPANY, INC.; HILL-ROM SERVICES, | ) | |
| INC. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff Linet Americas, Inc. ("Linet"), by and through its undersigned counsel, hereby files this Complaint against Defendants Hill-Rom Holdings, Inc., Hill-Rom Company, Inc., and Hill-Rom Services, Inc. (collectively, "Hillrom"), and alleges based on personal knowledge as to its own conduct and acts and events taking place in its presence, and on information and belief as to all other conduct, acts, and events, as follows:

### INTRODUCTION

The United States is battling a global pandemic.  Hospital capacity—measured by open hospital beds—has come to represent the ability of the American health care system to handle repeated surges of sick patients.  As COVID-19 cases and new variants continue to spread across the country, hospitals are overwhelmed and, in some areas, lack the beds necessary to treat critically ill patients, thereby creating an unprecedented spike in demand for the resources needed to save patients' lives.

In the middle of this public health crisis stands Hillrom, the dominant supplier of hospital beds in the U.S. and a serial abuser of the antitrust laws.  Indeed, over the past two decades, Hillrom

1

has paid over half a billion dollars to customers and competitors for repeated, flagrant violations of the antitrust laws as it has aggressively sought to leverage its entrenched hospital bed monopoly through a variety of exclusionary and anti-competitive tactics. This conduct has allowed Hillrom to secure a stranglehold on the hospital bed market and extinguish any meaningful challenge to its dominance. Many former and would-be rivals to Hillrom were forced to exit the market long ago, and competitive entry has been nearly nonexistent for over a decade. As a result, the constraint that competition would otherwise place on Hillrom's monopoly power has disappeared, and the severe consequences of that market reality are now reverberating throughout our public health system.

Plaintiff Linet is one of the last remaining companies attempting to compete with the Hillrom juggernaut. A leading supplier in Europe with a sterling reputation for technical innovation and a strong clinical following, Linet entered the U.S. market in 2010 to help cash-strapped hospitals struggling with high prices and poor service. At the time, Hillrom controlled an estimated 70-90% of the U.S. hospital bed market. As a monopolist, Hillrom had recently entered into a $337.5 million settlement of a nationwide antitrust class action brought by its customers for monopolizing the standard hospital bed markets through exclusive dealing and other anti-competitive tactics. Importantly, as part of the settlement, Hillrom had been forced—by customer demand—to stop leveraging its monopoly power and to separately price and discount each of its products in order to preserve competition. Linet's entry into the U.S. market was thus predicated on the belief that it would be able to compete freely with Hillrom on the merits—a contest Linet was confident it could win with its superior product quality and pricing—and that Hillrom would respect its customers' desire for such competition. The term of the injunction expired, however, just as Linet was preparing to enter the market.

Linet's initial entry into the U.S. market was a resounding success.  Customers lauded the technological superiority and pricing of Linet's products and, as a result, it quickly gained share.  Hillrom initially ignored its promising younger rival.  Soon, however, it came to realize that Linet posed an existential threat to its empire.  Hillrom thus faced a choice: compete with Linet on the merits as its customers demanded or take advantage of the injunction's expiration and return to its anti-competitive practices.  Hillrom chose recidivism.  As a dominant manufacturer faced with the prospect of losing market share to a more innovative and market-disrupting competitor in Linet, Hillrom knew that the only way to preserve its longstanding monopoly was to resurrect the same anti-competitive practices that its customers condemned in order to slow Linet's expansion and deprive it of the minimum economies of scale necessary to compete.

To do so, Hillrom created an aggressive, new "strategic sales" team with a mandate to leverage its market power and close deals by any means necessary.  The "strategic sales" team, in conjunction with Hillrom executives and senior management, quickly determined that the best way to preserve Hillrom's market share, foreclose competitors, and expand its control over the hospital room was to lock up the distribution channel by which suppliers sell hospital beds and other medical equipment to health care providers through a series of coercive and exclusionary tactics.  Specifically, over the past decade and continuing today, Hillrom has used its market power to coerce the largest hospital systems in the U.S. to enter into long-term, exclusive "Corporate Enterprise Agreements" that prevent them and their constituent hospitals from contracting with other hospital bed suppliers.  In so doing, Hillrom changed the traditional procurement model by taking the decision out of the hands of doctors and nurses—who prefer Linet's superior products by a wide margin—and instead going over their heads to coerce hospital administrators through a

variety of means into cutting confidential, long-term, exclusive deals that effectively locked Linet and other competitors out of the market going forward.

This private antitrust lawsuit—the latest in a series of successful antitrust lawsuits against Hillrom by competitors and customers—is brought to recover the substantial damages suffered by Linet at Hillrom's hand, preserve competition and adequate supply, ensure that struggling hospitals once again have meaningful choice in their selection of hospital bed products, and finally bring an end to Hillrom's anti-competitive reign. If Hillrom's conduct is not enjoined, there will be profound consequences for our public health system going forward. The last remnants of competition in the hospital bed market will be wiped out and, with it, the voices of doctors and nurses across the country who are demanding choice and fair competition. In addition, on a systemic level, innovation will be halted, health care costs will continue to rise, and the available supply of hospital beds will be further limited. Finally, Hillrom will make good on its plan to continue to leverage its expanding market power into adjacent medical equipment markets, slowly but assuredly gaining control of the entire hospital room with no competitors left to check its ambitions or constrain its behavior.

Indeed, as Hillrom continues to reap the benefits of its ongoing anti-competitive conduct, it has simultaneously cashed in on nearly a decade of anti-competitive tactics by selling the company to Baxter International, Inc., a medical technology conglomerate, for $10.5 billion. From Baxter's perspective, this deal is a "killer acquisition" and defensive merger intended to ward off future competition from Hillrom just as the latter was planning to expand into Baxter's core markets, which only serves to underscore the fear that Hillrom's history of bullying and anti-competitive conduct instills in the marketplace. This deal will further lessen competition in the hospital bed market and exacerbate the anti-competitive effects of Hillrom's existing conduct by

4

creating a "super bundler" that would hold enormous power over hospitals across multiple product lines, including the full suite of technologically-integrated products that comprise the "smart" hospital room of the future.

Now, more than ever, the antitrust laws are badly needed in the hospital room to ensure that doctors and nurses have the necessary resources to deal with the current pandemic and any future crisis in a way that puts patients—not supra-competitive corporate profits—first. This antitrust lawsuit is thus necessary to protect the resiliency of the U.S. hospital bed industry at a time when maintaining an adequate, affordable supply of hospital beds could not be more important.

## PARTIES

1.     Linet Americas, Inc. is a corporation organized under the laws of North Carolina with its principal place of business at 9115 Harris Corners Parkway, Suite 150, Charlotte, North Carolina, 28269. Linet is the U.S. subsidiary of Linet Group SE, a leading global manufacturer and supplier of hospital beds. Linet regularly transacts business in the State of Illinois and this judicial district through interstate commerce.

2.     Hill-Rom Holdings, Inc. is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 130 East Randolph Street, Suite 1000, Chicago, IL, 60601. Hill-Rom Holdings, through its direction and control of subsidiaries, is a worldwide manufacturer and supplier of medical technologies and related services for the health care industry, including the manufacture and sale of hospital beds to medical providers through interstate commerce. It regularly transacts business in the State of Illinois and this judicial district through interstate commerce. It may be served with process by serving its registered agent: CT Corporation System, 208 So. LaSalle St., Suite 814, Chicago, IL, 60604.

3.      Hill-Rom Company, Inc. is a wholly-owned subsidiary of Hill-Rom Holdings, Inc. and is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 130 East Randolph Street, Suite 1000, Chicago, IL, 60601.   Hill-Rom Company sells and distributes Hillrom products.   It regularly transacts business in the State of Illinois and this judicial district through interstate commerce.   It may be served with process by serving its registered agent: CT Corporation System, 208 So. LaSalle St., Suite 814, Chicago, IL, 60604.

4.      Hill-Rom Services, Inc. is a wholly-owned subsidiary of Hill-Rom Holdings, Inc., and is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 130 East Randolph Street, Suite 1000, Chicago, IL, 60601.  Hill-Rom Services controls licensing of Hillrom products.   It regularly transacts business in the State of Illinois and this judicial district through interstate commerce.   It may be served with process by serving its registered agent: CT Corporation System, 208 So. LaSalle St., Suite 814, Chicago, IL, 60604.

## JURISDICTION AND VENUE

5.      This action arises under the federal antitrust statutes and the statutory and common law of Illinois.   The alleged violations affect interstate commerce, as Hillrom operates in interstate commerce by contracting for the sale of medical equipment across state lines.

6.      This court has subject matter jurisdiction pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), 28 U.S.C. §§ 1331 and 1337, and 28 U.S.C. § 1367.   Linet brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorney's fees for Hillrom's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, Section 3 of the Clayton Act, 15 U.S.C. §14, and applicable state law.

7.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

8.      This court has subject matter jurisdiction over Linet's state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to claims within the court's original jurisdiction that they form part of the same case or controversy.

9.      This Court has personal jurisdiction over Hillrom pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because, inter alia, (a) Hillrom regularly does business in the State of Illinois, and (b) because it maintains an office, place of business, and/or agency for transacting business in the State of Illinois.

10.      In addition, this Court has personal jurisdiction pursuant to Illinois Statute 735 ILCS 5/2-209(b)(4).

11.      Venue is proper in the United States District Court for the Northern District of Illinois pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because Hillrom resides, transacts business, is found, and has agents in this district, and because a substantial portion of the events giving rise to Linet's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the Northern District of Illinois.

### LINET'S REPUTATION AS AN INNOVATIVE MARKET DISRUPTOR

12.      Linet Americas, Inc. ("Linet") is the subsidiary of an award-winning global manufacturer of hospitals beds with an established reputation for technical innovation and product design and a strong clinical following in hospitals around the world.

13.      Linet represents the first entry of leading global hospital bed manufacturer Linet Group SE ("Linet Group") into the U.S. hospital bed market.  Linet Group is one of the largest hospital bed suppliers in Europe, and a global leader in the manufacture and supply of hospital

beds. Linet Group employs over 1,900 employees in an organization with three manufacturing locations and several subsidiaries and partners around the world. Millions of healthcare professionals are using the 1.2 million Linet beds installed in over 120 countries to care for their patients.

14.     Linet Group defines the highest standards of quality in the production of hospital and nursing beds. The company regularly introduces products and services with innovative features and functions that reduce physical demands on hospital staff, enhance the efficacy of care provided and increase patient comfort. It also works intensively on developing such products in collaboration with healthcare professionals and respected experts in various scientific fields, enabling the company to keep abreast of new trends in the area of medical care.

15.     Linet Group has won a wide range of prestigious global industry and business awards. The company has been awarded the prestigious Ruban d´Honneur medal at the European Business Awards and the Award for Design Excellence four times over. Company co-owner Zbyněk Frolík, moreover, was recognized with the Business Person of the Year award and decorated by the President of the Czech Republic with a State Honor—the Medal of Merit—in 2011.

16.     Since its inception, Linet Group has been highly successful in Europe, and holds market-leading positions in many European countries, including Germany, Spain, France, Italy, and Sweden.

17.     Linet Group has built a unique brand and strong reputation internationally based on the quality and innovation of its products.

18.     Linet carries on this tradition in its own right by offering a full line of standard, intensive care, and other specialty hospital beds in the U.S.

19.     Linet's hospital bed technology is developed in collaboration with a clinical advisory panel of over 150 nurses from 6 different countries.  This diverse perspective enables the company to incorporate leading practices from around the world while offering the latest technology with a low cost of ownership.

20.     Linet's standard hospital beds are designed for use throughout a hospital to care for patients.  Linet's beds have an open architecture that can be customized to create the right bed for the specific needs of each environment.  Innovative features include Linet's proprietary frame-based lateral tilt up to a maximum of 15 degrees to assist with turning a patient, Ergoframe® design to reduce patient movement and minimize pressure as the bed articulates, i-Brake® intelligent automatic braking, and i-Drive fifth wheel that automatically engages when the bed is moving to enhance maneuverability, among other solutions that improve patient safety and comfort and reduce effort for health care providers.

21.     Linet's intensive care hospital beds are designed for use in special departments of a hospital to care for patients in critical condition that require advanced functionality.  Added technology supports vital patient functions and provides excellent working conditions for staff to help minimize the risks associated with caring for high acuity patients.  For example, Linet's proprietary frame-based lateral tilt is enhanced through programming to allow the bed to rotate patients up to 30 degrees in very precise increments while maintaining spinal alignment.  This innovative platform provides continuous lateral rotation therapy that can assist with the treatment of pulmonary complications, patient recovery and prevent medical complications associated with critically ill patients.  Among other benefits, these advanced features help Linet products address the specific pulmonary needs of COVID-19 patients.

22.     Linet also offers market-leading birthing and pediatric beds.

23. Linet's birthing bed, the Ave 2, is widely recognized as "best of breed." The bed is easily adjustable to accommodate a range of birthing positions, offering laboring mothers maximum safety and comfort. The Ave 2 has received praise across the U.S., and it has won the most prestigious annual design award—the Red Dot Award—for its innovative design.

24. Linet's pediatric products also feature innovative designs tailored to children. Linet's Tom 2 bed has won international prizes for innovation, including the Plus X Best Product of the Year Award in the Family and Kids section.

25. Following Linet Group's success in Europe and around the world, and after careful and extended consideration, Linet entered the U.S. hospital bed market in 2010, establishing headquarters in Charlotte, North Carolina.

26. Linet is a potential market disruptor in the U.S. Indeed, Linet's beds offer a strong value proposition for U.S. customers because of their superior technological innovation and economical price compared to existing U.S. hospital bed suppliers. Linet's entry into the U.S. market thus helps cash-strapped hospitals address the pressures and concerns associated with rising health care costs.

27. Linet provides the same innovative, award-winning products to U.S. hospitals as Linet Group does globally. Unsurprisingly, since entering the U.S. market, Linet has won several additional awards for innovation. Recent accolades include three Innovative Technology Contracts in 2019 awarded to Linet by Vizient, the largest group purchasing organization in the U.S., for Medical Surgical, Intensive Care, and Labor & Delivery Bed Products.

28. Linet also provides hospitals with an affordable alternative to the monopoly-driven prices on hospital beds typically demanded by Hillrom, the dominant supplier. For example,

Linet's standard hospital and ICU bed offerings feature a price tag about 10-30% lower than other U.S. competitor's standard beds with superior or similar functionality.

29.     Further, Linet's beds cost less to maintain than Hillrom's, tilting the total cost of ownership even more in favor of Linet.  Market research shows that Hillrom's standard hospital beds have an average annual service cost of $411, whereas service costs for Linet's standard beds are only $270 per year.  For a product with a useful life of 10-15 years that hospitals maintain by the hundreds, that cost differential translates into significant savings for hospitals when considering total cost of ownership.

30.     When given the choice, hospitals prefer Linet's innovation and lower prices over the competition.  Indeed, Linet has won numerous clinical trials conducted by potential purchasers and, when given the chance to compete on the merits, secures a high percentage of head-to-head sales opportunities.

31.     Linet's mission is to be instrumental in improving the standard of U.S. healthcare and nursing services and to define the highest standard of quality in the production of hospital beds.  In order to ensure that it fulfills this mission, Linet's decisions are governed by five principles: Innovation, Simplicity, Passion, Confidence, and Trust.  Each of Linet's products and services include unique features that a customer is not able to get from Linet's competition.  The technological features of its products and services are in tune with its clients' everyday reality.  To that end, Linet works transparently and predictably in its relations with customers.  It believes in its products and "plays by the rules" on the conviction that its product offering speaks for itself.

32.     As the global pandemic raged, Linet Group saw itself as uniquely situated to help healthcare workers and patients.  For example, it responded to the initial spread of the coronavirus by dramatically increasing supply of its critical care beds internationally, almost doubling the

manufacture of its ICU bed product, the primary model used to care for critically ill COVID-19 patients. In April 2020, Linet Group released for immediate sale all available beds, including those used for demonstrations or trainings, and rapidly developed tools to help clinical staff better utilize Linet products in the treatment of COVID-19 patients.

33.     In the past year alone, the Linet Group has manufactured 120,000 healthcare beds globally, a 10% increase from its prior year production and more beds than any other bed manufacturer in the world, thereby helping its customers deal with the unique challenges presented by the global pandemic.

## RELEVANT MARKETS AND MARKET POWER

### The U.S. Hospital Bed Industry

34.     The U.S. hospital bed industry is valued at over a billion dollars.

35.     The U.S. hospital bed industry is expected to grow over the next five years due to a number of factors, including population migration, increased demand caused by the COVID-19 pandemic, a rise in chronic disease, a rapidly aging population, and new innovative products that improve patient care and nurse effectiveness and efficiency.

36.     The U.S. hospital bed industry is a crucial component for the delivery of health care because its products are central to how health care providers take care of sick patients. Indeed, the size of hospitals and other medical facilities is frequently measured by the number of staffed hospital beds they contain, which corresponds to their capacity to admit and care for sick patients.

37.     Hospital beds have taken on an even greater significance during the global health crisis caused by the COVID-19 pandemic. Beds are essential pieces of physical equipment, and demand for them increased exponentially as millions of Americans affected by COVID-19 were hospitalized. Simply put, if there is no bed, there is no place to admit the patient beyond the

emergency room.  The lack of available beds due to the unprecedented numbers of sick patients has also become a symbolic indicator of the current strain on the nation's health system.

38.     This heightened significance of hospital beds to public health and welfare makes it essential that the hospital bed industry function in a free and fair manner.  Hospitals need affordable options to acquire additional hospital bed capacity at a low price to meet rising demand.  But, if they are to do so in a way that serves public welfare rather than line the pockets of entrenched interests, they need to have a choice among suppliers.

39.     The U.S. hospital bed industry is highly concentrated, with the vast majority of the industry accounted for by the largest and most dominant supplier, Hillrom.

40.     Over the past decade, the installed base of staffed hospital beds in the U.S. has remained relatively stable at approximately 778,000 total hospital beds in the key markets described more fully below.

41.     With increasing demand, some analysts project the number of beds in the U.S. to grow by 15% over the next 3-5 years.

42.     The U.S. hospital bed industry is comprised of several different product segments. The largest and most important segment is the standard hospital bed segment, which makes up the majority of the market with approximately 666,000 standard hospital beds ("Standard Hospital Beds") installed in U.S. hospitals.  The second largest segment is the ICU hospital bed segment, with roughly 86,000 ICU beds ("ICU Beds") installed in U.S. hospitals.  Birthing beds comprise a smaller segment of approximately 26,000 birthing beds ("Birthing Beds") installed in U.S. hospitals.  Other specialty beds, like psychiatric, bariatric and neonatal beds, make up the smaller remaining hospital bed segments.

43.     For purposes of this Complaint, there are three relevant product markets: the Standard Hospital Bed market in the United States, the ICU Bed market in the United States, and the Birthing Bed market in the United States.  Collectively, these three markets are the Relevant Markets, and these types of beds are the Relevant Products.

*The Standard Hospital Bed Market*

44.     The market for Standard Hospital Beds is a distinct product market.  Standard Hospital Beds, also referred to as universal beds or medical-surgical ("med-surg") beds, are generic beds used throughout a hospital to care for the majority of admitted and non-critical patients.  They feature a heavy metal frame and adjustable mattress.

45.     The healthcare industry recognizes Standard Hospital Beds as a separate product market.

46.     Standard Hospital Beds are priced as a distinct product, with a separate price point from other types of hospital beds and surfaces.

47.     Group purchasing organizations, integrated delivery networks, hospitals and other entities that are involved in contracting for or purchasing Standard Hospital Beds treat Standard Hospital Beds as a separate product category, and hospitals and vendors enter Standard Hospital bed contracts that are separate from contracts for the sales of other types of beds.

48.     Hillrom also treats Standard Hospital Beds as a standalone product market, listing it as a category separately from other types of hospital bed products on its website and discussing it as a separate product category in public statements to investors and industry analysts.

49.     Other competitors in the Standard Hospital Bed Market likewise treat it as a standalone product market.

50.     There are no reasonably interchangeable products with Standard Hospital Beds.

51.     There is no cross-elasticity of demand between Standard Hospital Beds and other products.

52.     In response to a small but significant increase in price, customers would not substitute Standard Hospital Beds for other products such as ICU Beds or long term care hospital beds because ICU Beds are much more expensive than Standard Hospital Beds and long term care hospital beds do not have the necessary functionality and features to care for patients in a critical care setting.

53.     The relevant geographic market for the sale of Standard Hospital Beds is the United States.  Although some suppliers that sell in the U.S. market manufacture beds internationally, and suppliers compete outside of the U.S. for international sales, the sale of hospital beds into the U.S. market is distinct from sales into other countries.  U.S. hospital customers demand that suppliers have a local sales and service organization in order to provide dedicated sales support, as well as in-service training, education, and clinical support specific to the U.S. health care industry.  U.S. hospital customers also expect suppliers to provide service and maintenance for beds placed in U.S. facilities by trained technicians familiar with specific manufacturer's equipment, all of which require a physical presence in the country and specific knowledge of the U.S. market.  In response to a small but significant increase in price, customers would not look to purchase Standard Hospital beds directly from international suppliers because they rely on all of the aforementioned market necessities to keep hospital beds in safe working order over their long capital lifespan.

54.     The Standard Hospital Bed market in the U.S. is highly concentrated.  After decades of Hillrom's dominance and anti-competitive conduct, there are now only two principal competitors to Hillrom in the Standard Hospital Bed market: Stryker Corporation ("Stryker") and Linet.  Each competitor sells one or more model of Standard Hospital Beds.  The different models

of Standard Hospital Beds made by each manufacturer are all close substitutes and can be used interchangeably.

55.     Hillrom currently offers only one type of Standard Hospital Bed product—the Centrella bed—to customers for purchase.

56.     Hillrom manufactures Standard Hospital Beds and sells them to medical facilities in all 50 states, including this judicial district, through interstate commerce under supply agreements with its customers.

57.     Hillrom wields monopoly and market power in the Standard Hospital Bed market.

58.     Hillrom's enjoys a market share of at least 75% of Standard Hospital Beds installed in U.S. hospitals.  There are approximately 666,000 Standard Hospital Beds installed in U.S. hospitals, and as recently as August 2019, Hillrom told investors that it had a "tremendous number of existing installed base" of over 500,000 Standard Hospital Beds in the U.S.

59.     Hillrom itself has repeatedly boasted to investors that it enjoys over 70% installed base in the Standard Hospital Bed category.

60.     The health care industry, including manufacturers, customers, and financial analysts, all recognize installed base, rather than annual sales, as the appropriate measure of market share.

61.     Installed base is the only appropriate measure of market power because the Standard Hospital Bed market is mature, heavily penetrated, and characterized by episodic rather than smooth demand.  Even though there are around 778,000 staffed beds in the Relevant Markets installed in U.S. hospitals, annual sales are typically less than 50,000 beds to 60,000 beds, or only 5-7% of the overall installed base.  But annual sales are extremely volatile and can spike in years when hospitals make large capital buys or decline steeply when capital budgets are tight.  Many

16

hospitals, for example, made large buys in the mid-2000s and won't replace beds at scale until the end of the beds' useful life. A given supplier's revenue may thus skyrocket in a year with a large capital buy and then plummet in other years for a prolonged period of time, even though it remains the dominant player in the market.

62. Market participants and industry experts use installed base to measure market share because it controls for the episodic nature of bed purchases and measures the durability of a given supplier's market power.

63. Hillrom itself measures its market share by installed base, noting publicly the "inherent lumpiness" in the hospital bed business that can result in "big swings" from quarter-to-quarter and year-to-year. This is why Hillrom shares its installed base figures with investors, rather than its annual market share of bed sales.

64. Even if Hillrom's market share is not measured by installed base, Hillrom also enjoys a market share of at least 64% of Standard Hospital Beds based on estimated annual market sales.

*The Intensive Care Bed Market*

65. The market for intensive care beds ("ICU Beds") is a distinct product market. ICU Beds require advanced functionality to care for patients in critical care condition. ICU Beds are electric beds that can be maneuvered in specific ways to relieve pressure and facilitate respiration and circulation. They are used in units where constant, close monitoring and support is provided to patients with severe and life-threatening conditions and injuries.

66. The healthcare industry recognizes ICU Beds as a separate product market.

67. ICU Beds are priced as a distinct product, with a separate price point from other types of hospital beds and surfaces.

68.     Group purchasing organizations, integrated delivery networks, hospitals and other entities that are involved in contracting for or purchasing ICU Beds treat them as a separate product category, and hospitals and vendors enter ICU bed contracts that are separate from contracts for the sales of other types of beds.

69.     Hillrom also treats ICU Beds as a standalone product market, listing "Intensive Care Unit" beds separately from other types of hospital bed products on its website and discussing ICU Beds as a separate product category in public statements to investors and industry analysts.

70.     Other competitors in the ICU Bed market likewise treat it as a standalone product market.

71.     There are no reasonably interchangeable products with ICU Beds.

72.     There is no cross-elasticity of demand between ICU Beds and other products.

73.     In response to a small but significant increase in price, customers would not substitute ICU Beds for other products such as Standard Hospital Beds or long term care hospital beds because those other products do not have the necessary functionality and features to care for patients in a critical care setting.

74.     The relevant geographic market for the sale of ICU Beds is the United States. Although some suppliers that sell in the U.S. market manufacture beds internationally, and suppliers compete outside of the U.S. for international sales, the sale of hospital beds into the U.S. market is distinct from sales into other countries. U.S. hospital customers demand that suppliers have a local sales and service organization in order to provide dedicated sales support, as well as in-service training, education, and clinical support specific to the U.S. health care industry. U.S. hospital customers also expect suppliers to provide service and maintenance for beds placed in U.S. facilities by trained technicians familiar with specific manufacturer's equipment, all of which

require a physical presence in the country and specific knowledge of the U.S. market. In response to a small but significant increase in price, customers would not look to purchase ICU Beds directly from international suppliers because they rely on all of the aforementioned market necessities to keep hospital beds in safe working order over their long capital lifespan.

75.     The ICU Bed market is highly concentrated. After decades of Hillrom's dominance and anti-competitive conduct, there are now only two principal competitors to Hillrom in the ICU Bed market in the U.S.: Stryker and Linet. Each competitor sells one or more models of ICU Beds. The different models of ICU Beds made by different manufacturers are all close substitutes and can be used interchangeably.

76.     Hillrom offers only one type of ICU Bed product to customers, its Progressa bed.

77.     Hillrom manufactures ICU Beds and sells them to medical facilities in all 50 states, including this judicial district, through interstate commerce under supply agreements with its customers.

78.     Hillrom wields market power in the ICU Bed market.

79.     The installed base of ICU Beds in the U.S. is roughly 86,000 beds. Installed base, as explained above, is the relevant measure of market share in the hospital bed industry. Hillrom's estimated installed base of ICU Beds exceeds 70%.

80.     Even if Hillrom's market share is not measured by installed base, Hillrom also enjoys a market share of at least 75% of ICU Beds based on estimated annual market sales.

81.     The ICU Bed market is expected to grow significantly over the next five years. Indeed, as recently as 2020, Hillrom projected that the size of the ICU Bed market would double over the next four years and publicly stated to investors that it would represent a $200 million incremental opportunity for the company. With the rapid spread of the coronavirus, healthcare

providers are concentrating on increasing the capacity of ICU Beds to help address the crisis, which results in pulmonary illness and often requires patients to be placed in a prone position (on their stomach), requiring enhanced bed features.

*The Birthing Bed Market*

82.    The market for birthing beds ("Birthing Beds") is a distinct product market. Birthing Beds are used in hospital labor and delivery units to care for patients before, during, and potentially after giving birth.  These electric beds typically feature an adjustable backrest, seat, and foot, and may accommodate birthing-specific features like foot and leg supports, handgrips, labor/squatting bars, drain pans, IV poles, and arm boards.  Many birthing beds are designed to accommodate various birthing positions.  Birthing beds are also referred to as labor and delivery (L&D) beds.

83.    The healthcare industry recognizes Birthing Beds as a separate product market.

84.    Birthing Beds are priced as a distinct product, with a separate price point from other types of hospital beds and surfaces.

85.    Group purchasing organizations, integrated delivery networks, hospitals and other entities that are involved in contracting for or purchasing Birthing Beds treat them as a separate product category, and hospitals and vendors enter Birthing Bed contracts that are separate from contracts for the sales of other types of beds.

86.    Hillrom itself treats Birthing Beds as a standalone product market, listing "Labor & Delivery Postpartum" beds separately from other types of hospital bed products on its website.

87.    Other competitors in the Birthing Bed market likewise treat it as a standalone product market.

88.    There are no reasonably interchangeable products with Birthing Beds.

89.     There is no cross-elasticity of demand between Birthing Beds and other products.

90.     In response to a small but significant increase in price, customers would not substitute Birthing Beds for other products such as Standard Hospital Beds, ICU Beds, or long term care hospital beds because those other products do not have the specific functionality and features designed to allow laboring mothers to safely and comfortably deliver a baby.

91.     The relevant geographic market for the sale of Birthing Beds is the United States. Although some suppliers that sell in the U.S. market manufacture beds internationally, and suppliers compete outside of the U.S. for international sales, the sale of hospital beds into the U.S. market is distinct from sales into other countries.  U.S. hospital customers demand that suppliers have a local sales and service organization in order to provide dedicated sales support, as well as in-service training, education, and clinical support specific to the U.S. health care industry.  U.S. hospital customers also expect suppliers to provide service and maintenance for beds placed in U.S. facilities by trained technicians familiar with specific manufacturer's equipment, all of which require a physical presence in the country and specific knowledge of the U.S. market.  In response to a small but significant increase in price, customers would not look to purchase Birthing Beds directly from international suppliers because they rely on all of the aforementioned market necessities to keep hospital beds in safe working order over their long capital lifespan.

92.     The Birthing Bed market is highly concentrated.  There are now only two remaining competitors to Hillrom in the Birthing Bed market in the U.S: Stryker and Linet.  Each of the remaining competitors sells one or more models of Birthing Beds.  The different models of Birthing Beds made by different manufacturers are all close substitutes and can be used interchangeably.

93.     Hillrom's Birthing Bed is the Affinity 4 bed.

94.     Hillrom manufactures Birthing Beds and sells them to medical facilities in all 50 states, including this judicial district, through interstate commerce under supply agreements with its customers.

95.     Hillrom wields market power in the Birthing Bed market.

96.     The installed base of Birthing Beds in the U.S. is roughly 26,000 beds. Installed base, as explained above, is the relevant measure of market share in the hospital bed industry. Hillrom's estimated installed base of Birthing Beds exceeds 70%.

97.     Even if Hillrom's market share is not measured by installed base, Hillrom also enjoys a market share of at least 74% of Birthing Beds based on estimated annual market sales.

**The Customers and Distribution Channels in the Relevant Markets**

98.     There are approximately 5,500 individual hospitals in the U.S. providing care to patients across the country. Each of these hospitals require certain equipment in order to provide such care, including hospital beds and surfaces.

99.     Hospital beds are typically purchased by individual hospitals who purchase beds for their facilities to care for admitted patients.

100.    Individual hospitals, however, typically do not negotiate directly with suppliers regarding contract terms for the purchase and sale of hospital beds. Instead, individual hospitals place purchase orders for hospital beds based on pricing agreements that have been negotiated with suppliers in advance through group purchasing organizations or integrated delivery networks, of which they are a part, that specify the product offerings and applicable terms.

101.    Importantly, these overarching pricing agreements negotiated by group purchasing organizations and integrated delivery networks do not constitute an agreement to purchase a

specific quantity of hospital beds now or in the future.  Instead, they merely set out the price and other terms for future purchases made by the customer during the effective period of the contract.

102.    Hospitals typically make large capital purchases of hospital beds only in certain circumstances (*e.g.* new hospital, modernization program, etc.) or when their existing hospital beds reach the end of their useful life and trigger a replacement cycle.

103.    Outside of these large and irregular capital buys, hospitals typically buy hospital beds in small increments, and the decision to purchase beds is made at the individual hospital level based on that hospital's need to replace beds that are outdated or unrepairable.

*Group Purchasing Organizations*

104.    Group purchasing organizations ("GPOs") are important relationships for hospital bed suppliers.  GPOs act as purchasing intermediaries that negotiate contracts between their customers—health care providers, such as hospitals—and suppliers of medical equipment and products.  They serve as gatekeepers to screen suppliers and establish base-level pricing and contract terms.  Hospital customers use these agreements as starting points to define their final price and contract terms for the purchase of hospital beds.  According to GPOs, they lower transaction costs and pool the purchasing power of their members to negotiate lower prices on products from suppliers.

105.    Hospitals join GPOs in order to outsource the contract negotiation process and gain access to the GPOs' negotiated agreements.  An estimated 98% of U.S. hospitals use GPOs to help them with the procurement process, and these hospitals use an average of two to four GPOs per facility.

106.     GPOs vary in their organizational and ownership structures.  For example, some GPOs have an ownership relationship with their customers (*e.g.* the HealthTrust GPO and HCA), and some do not.

107.     The GPO industry has undergone significant consolidation over the last two decades.  Now, there are only four major national GPOs: Vizient, Premier, HealthTrust, and Intalere.  Any vendor who wishes to sell products to hospitals and other health care providers must typically go through one of these four national GPOs in order to gain access to IDNs and their individual hospital members.

108.     The GPO industry now typically bids out and contracts for hospital equipment at the product level.

109.     The GPO contracting process generally includes several phases: the identification and selection of products to place on contract, requests for proposals or invitations for vendors to bid for contracts, review of submitted proposals and applications from vendors, clinical assessment of the quality of products that vendors propose by doctors and nurses, negotiation of contracts between hospital procurement officials and vendors, and finally contract award.

110.     The negotiation process also determines the contract administrative fee paid by the vendor to the GPO.  GPOs are predominately funded by administrative fees collected from vendors, which are almost always based on a percentage of the purchase price for products obtained through GPO contracts.  Put another way, a supplier pays a fee to the GPO whenever a member hospital buys product based on a pricing agreement the GPO negotiated with the supplier.

111.     According to the U.S. Government Accountability Office, the average administrative fee for a GPO contract is between 1.75% and 2%.  However, there can be significant variation in the administrative fees paid by vendors, including vendors competing for or awarded

a place on the same GPO contract for a given product. New vendors attempting to break into GPO contracting are sometimes required to agree to pay a higher administrative fee, which affects the pricing that the vendor can offer customers or the vendor's potential profit margin. Typically, only a few vendors for a product can afford to pay GPO administrative fees and gain access to those customers. Vendors who cannot afford to sell through GPOs miss out on an efficient means to market their product to U.S. hospital customers.

112. GPO members can make purchases under the pre-negotiated agreements during the time period that the agreement is in effect. Purchasing under a GPO-negotiated agreement allows the hospital customer to avoid investing time and resources into evaluating and selecting among products or negotiating terms of purchase. Certain hospitals, typically smaller independent hospitals, also may receive a better price than if they negotiated directly with the supplier based on their own purchase volume.

113. It is important for suppliers in the hospital bed industry to be awarded GPO contracts because it gives them access to hospital systems and individual hospital customers. Conversely, a supplier that is not on a GPO contract is cut off from the vast majority of hospitals in the country. Exclusion from a GPO contract is particularly damaging where the supplier is new in the market or does not have a preexisting relationship with the customer.

114. GPO contracts are referred to as "hunting licenses" by suppliers insofar as they only provide the supplier with the opportunity to sell to the GPO's members. Actual sales of product must be transacted directly with a hospital system or individual hospitals pursuant to the terms of the GPO contract.

*Integrated Delivery Networks*

115.    Integrated delivery networks ("IDNs") have become increasingly important to both customers and suppliers for the purchase and sale of hospital beds.  An IDN, also referred to as a health system, is typically defined as an organization that owns or manages two or more hospitals along with other allied healthcare providers.

116.    Hospitals—especially rural or smaller ones—have been operating on thin margins and under financial pressure to lower costs for decades.  The Great Recession in 2008-09 exacerbated this issue.  Consolidation was a solution to lower operating costs for many hospitals.

117.    The Affordable Care Act ("ACA") in 2010 accelerated the trend as hospitals were encouraged to form Accountable Care Organizations ("ACOs") to participate in the Medicare Shared Savings Program.  IDNs proliferated as hospitals began leveraging their capital and regional branding to evolve into large networks.

118.    ACOs tie payments to quality metrics rather than operating on a fee-for-service model.  Legislative changes incentivizing this value-based model led hospitals to coordinate vertically and horizontally with other hospitals and health care providers via IDNs to offer holistic patient care spanning the "continuum of care." This includes everything from preventative care and urgent care, to post-acute care, treatments, and therapies.  By offering comprehensive services, an IDN can attract and serve all or most patient needs and offer a consistent brand with regional or national recognition.

119.    Today, over a decade after the passage of the ACA, IDNs are the dominant institutional care model, and the IDN distribution channel is now the most significant and efficient channel for suppliers looking to sell medical equipment and other products to U.S. hospital systems and individual hospitals.

120.    There are at least 576 IDNs in the U.S. today.

121.    More than 80% of U.S. hospitals are affiliated with an IDN.

122.    More than 91% of hospital beds in the U.S. are affiliated with an IDN.

123.    There are no alternative distribution channels or outlets for competitors to sell medical equipment and other products to hospitals, let alone inferior or more expensive ones.

124.    The IDN distribution channel is highly concentrated.  The top ten IDNs cover more than 1,175 hospitals and account for over 20% of all hospital beds in the U.S.  They include large hospital systems such as Hospital Corporation of America ("HCA"), Kaiser Permanente, Common Spirit, Ascension, Providence, Tenet, and Trinity.  HCA, the nation's largest IDN, owns hundreds of hospitals and 2,000+ sites of care in 20 states and boasts over 32 million annual patient encounters, recording over $50 billion in revenue for 2020.

125.    The concentration in the IDN distribution channel is expected to significantly increase in the years ahead.  A recent study estimates that only 50% of current health systems will likely remain as consolidation increases over the next decade.  Further, the financial effects of the coronavirus pandemic are expected to drive more consolidation between and among hospitals and physician practices.

126.    The growth of IDNs is significant because of the more centralized decision making that IDNs enable.  One estimate finds as many as 80% of IDNs have system-wide policy and practice mandates that are applied to individual hospitals.  That means many decisions are being moved away from individual hospitals and into the matrix of issues and concerns addressed by IDNs at a systemic level.  The result of this shift is that executives or administrators within IDNs can often be the decision-makers for all of their member hospitals.

127. An IDN's common ownership and control also allows it to be far more capable than GPOs of driving contract compliance by forcing individual hospitals to purchase their requirements from the selected vendor and punishing any off-contract purchases. Because GPOs do not own hospitals or purchase any product themselves, they cannot promise any purchase volume to suppliers. But IDNs own member hospitals and can thus drive compliance and volume within a fiscal year. This often allows certain IDNs to secure better pricing and terms than are found in GPO contracts.

128. The end result is extremely high stakes for hospital bed suppliers when they are competing for contracts with the large, national, and increasingly consolidated IDNs. Just like being excluded from GPO contracts could seriously limit a supplier's ability to reach the majority of U.S. hospitals, being unable to sell into a particular IDN can cut off a supplier from a significant portion of the market.

129. The IDN contracting process is traditionally at the product level.

130. The IDN contracting process is similar to the GPO contracting process, with a multi-phased procurement process that starts with a request for proposal ("RFP") and a clinical trial in which products are evaluated by doctors and nurses. If a product gains support during the clinical trial, the supplier may proceed to negotiation of an agreement with hospital administrators. Traditionally, the clinical preference of doctors and nurses was very influential and afforded great weight.

131. Hillrom, however, has driven a significant change in this dynamic in order to avoid having to compete with Linet and others at the product level. By doing so, Hillrom has sought to take the decisions out of the hands of doctors and nurses and instead shifted its focus to more

bottom line-oriented administrators and procurement officials where its anti-competitive strategy is more likely to be successful.

**Hillrom's Monopoly Power**

132.    Hillrom has monopoly power in each of the Relevant Markets.

133.    Hillrom's monopoly power is durable and has existed for decades.

134.    Hillrom maintains greater than 70% share of the installed base in each of the Relevant Markets.

135.    The size and strength of Hillrom compared to Linet is substantial and disproportionate.  Indeed, as of November 2021, Hillrom had a market capitalization of $10.27 billion and it employed over 10,000 employees.  Following the Baxter acquisition, the combined company has a market capitalization over $45 billion and nearly 60,000 employees.  By comparison, Linet has a market capitalization of less than $500 million and less than 100 employees domestically and 1,900 employees worldwide.

136.    Hillrom has a demonstrated ability to control prices and exclude competition in the Relevant Markets.

137.    Hillrom's monopoly power is so strong that it has been able to drive change in customer contracting practices to its advantage.  Many customers, including large customers, fear Hillrom and its well-earned reputation for bullying customers and competitors alike.

138.    Hillrom's gross profit margins have increased steadily over the past decade, and the rate of increase in gross profit margins has accelerated over the past five years.

139.    Hillrom has attributed its gross margin expansion to its ability to increase the prices Hillrom charges its customers.  Indeed, when Hillrom recently announced yet another new record level gross margin, it told investors that the increase was particularly due to the higher margin it

was able to achieve on one-time purchases by customers struggling to deal with the COVID-19 pandemic.

140.     Over the past decade, there has not been a single significant competitor to enter the Relevant Markets.   To the contrary, many would-be competitors to Hillrom in the Relevant Markets have exited the markets.   Three competitors that Hillrom itself once identified as "significant" on its Annual SEC 10-K filings have exited the market or were deemed by Hillrom to be no longer competitively significant in the Relevant Markets, including Kinetic Concepts, Inc. and Joerns Healthcare LLC.

141.     The inability of these competitors to sustain sufficient sales in order to remain viable and relevant demonstrates that Hillrom's monopoly and exclusionary conduct has the effect of substantially lessening competition.

### Barriers to Entry in the Relevant Markets

142.     Hillrom's monopoly power is protected by mammoth barriers to entry.

143.     The Relevant Markets share common barriers to entry because each market requires that a supplier have similar expertise in medical equipment design, manufacturing, sales, distribution, service, and regulatory compliance and is subject to the same market dynamics.

144.     Specifically, the myriad barriers to entry a potential new entrant faces include (1) the significant capital investment required to enter the Relevant Markets; (2) Hillrom's entrenched monopoly and history of anti-competitive conduct; (3) Hillrom's longstanding relationships and exclusive dealing agreements with top IDNs; (4) standardization, the incumbency advantage, and switching costs; (5) Hillrom's intentionally closed digital platform ecosystem; (6) Hillrom's patents and aggressive patent enforcement; (7) the GPO administrative fee; and (8) the extensive nature of the regulatory regime applicable to medical equipment.

*Significant Capital Investment*

145.    The manufacture and sale of hospital beds is a capital-intensive business which acts as a natural barrier to entry.

146.    New entrants must invest heavily in research and product development, which requires significant resources and increasingly expensive talent.  All these costs must be incurred upfront.  There are significant lead times for research and development, the process for securing FDA compliance, and to achieve learning curve economies.

147.    New entrants must also finance and develop their own manufacturing facilities and distribution networks at scale to ensure they can meet the demand of their customers.  Without an existing customer base, prospective investment in such infrastructure is cost prohibitive.  However, without the necessary infrastructure, new entrants cannot compete for large hospital purchase agreements because they lack the scale to timely fill purchase orders.  This barrier to entry has become increasingly significant in recent years as consolidation in the health care industry has accelerated and individual customers have grown larger.

148.    Linet was uniquely situated to enter the U.S. market based on its existing investment in product innovation and its manufacturing and distribution infrastructure in Europe.  This existing investment and infrastructure allowed Linet to both offer competitive prices to customers and ensure that their demand for beds could be met in a timely manner.  A new entrant without a similar existing infrastructure would be effectively blocked from competing for similar capital agreements with hospital networks and individual hospitals.

149.    New entrants must also create an extensive sales and service infrastructure that is necessary to serve the U.S. market.  The large size of the U.S. market and wide geographic spread of hospitals throughout the U.S. requires major capital investment to recruit sales and marketing

talent, offer competitive compensation to retain employees, and put together a management structure to coordinate efforts and monitor performance and results. For example, in 2019, Hillrom's annual operating budget for its Enterprise Accounts team alone was $17 million.

150. New entrants who are able to establish manufacturing facilities also face significant and rising input costs in the U.S. To manufacture hospital beds, new entrants need to purchase commodities such as aluminum and steel that are subject to significant volatility. For example, the price of steel has more than doubled over the past five years. Similarly, hospital bed manufacturing increasingly requires chips and sensors, which are currently subject to a shortage that has led to rising prices throughout the country.

*Hillrom's Entrenched Monopoly and History of Anti-Competitive Conduct*

151. New entrants also must confront the artificial barrier created by Hillrom's entrenched monopoly and reputation for brutal, anti-competitive tactics, which serves as a deterrent to new entrants and makes it more difficult for them to obtain the financing necessary to make the significant capital investments required.

152. Hillrom's well-earned reputation for anti-competitive conduct has been the focus of numerous major antitrust lawsuits over the past two decades. These lawsuits alleged, among other things, that Hillrom employed illegal monopolization and exclusionary bundling practices to create, expand, and protect its market share. Indeed, they alleged that Hillrom used its dominant market share in the Standard Hospital Bed market as a lever to gain market power in adjacent markets and protect its existing monopoly power in the Standard Hospital Bed market.

153. The first lawsuit was brought against Hillrom in 1995 by Kinetic Concepts, Inc. ("KCI"), a competitor in the manufacture and rental of specialty hospital beds, mattresses, and related medical devices. KCI alleged that Hillrom and its predecessor, Hillenbrand Industries, Inc.

("Hillenbrand"), leveraged their monopoly power in the Standard Hospital Bed market to gain control in a related medical equipment rental market through exclusionary bundling practices. Specifically, KCI alleged that Hillrom conditioned large discounts on sales of its manufactured Standard Hospital Beds and headwall units on a commitment by GPOs to rent specialty hospital beds from Hillrom exclusively for a period of five or more years. In September 2002, a jury in the Western District of Texas returned a unanimous $173 million verdict in favor of KCI, finding that Hillrom had violated Section 2 of the Sherman Act. Hillenbrand eventually agreed to settle the case for $250 million.

154. Even after the verdict, KCI ultimately decided to exit the market.

155. Following the KCI verdict and settlement, a nationwide class of hospitals and health care providers led by Spartanburg Regional Healthcare System sued Hillrom and Hillenbrand in 2003 for damages arising from similar monopoly maintenance and anti-competitive actions. Spartanburg's Second Amended Complaint, filed after plaintiffs had conducted discovery, alleged that Hillrom had implemented a "secret plan" for over a decade that involved two main parts: first, Hillrom submitted RFP responses to GPOs and individual hospitals that offered only "bundled" bids with "discounts" requiring customers to commit to buying or renting 90% of their standard hospital beds, specialty beds, and other hospital products from Hillrom. Second, Hillrom inflated its hospital bed prices to offset the "discounts" it offered, rendering these discounts "illusory." Hillrom thus "false[ly]" represented that GPOs and hospital customers would "receive substantial discounts" if they acquiesced to Hillrom's bundle, but in reality, hospitals were stuck paying supracompetitive prices. The overall effect of Hillrom's conduct—per Hillrom's own customers—was fewer competitor suppliers, higher prices, and lower quality hospital beds.

156.     Hillrom ultimately settled with Spartanburg for $337.5 million.  As part of the settlement, Hillrom also agreed to an injunction that prevented Hillrom from leveraging its monopoly power in the market for the sale of Standard Hospital Beds for three years.  In other words, the injunction forced Hillrom to unbundle and separately price and discount each product.

157.     As the *Spartanburg* injunction was expiring in 2009, medical equipment rental supplier Freedom Medical Inc. sued Hillrom and another competitor in the medical equipment rental markets, along with two GPOs, alleging, *inter alia,* that Hillrom conspired to enter into exclusionary agreements with GPOs that foreclosed competitors and promised high administrative fees to GPOs in return.  Freedom alleged that the agreements excluded competition from other companies that hospitals might prefer to use.  Hillrom settled the claims on confidential terms in 2011.

158.     Upon the expiration of the *Spartanburg* injunction, Hillrom returned to its anti-competitive ways.  Universal Health Services ("UHS"), a competitor to Hillrom in the rental industry and aspiring entrant into the Standard Hospital Bed market, sued Hillrom in 2015 for the same type of anti-competitive conduct it was accused of in the *KCI, Spartanburg*, and *Freedom Medical* cases.  UHS alleged that Hillrom improperly "leveraged" its monopoly in the Standard Hospital Bed market by negotiating long-term, difficult-to-terminate, sole-source agreements with GPOs—the six largest of which controlled an estimated 90% of all hospital medical equipment purchases and rentals—and related hospital associations. UHS alleged that these agreements conditioned steep discounts and rebates on the sale of standard beds on "ironclad" commitments to use Hillrom exclusively for their members' patient handling equipment ("PHE") and moveable medical equipment ("MME") rental needs.  UHS alleged that the discounts offered by Hillrom dropped its price below cost.  Further, by bundling its standard bed monopoly with PHE and MME

rentals, Hillrom foreclosed a substantial part of the market. The parties settled the case, and Hillrom publicly announced that it had agreed to divest certain moveable medical equipment from its third-party rental business to UHS, which generated revenue of $35 million per year.

159. New entrants, even with pioneering products, must therefore consider the possibility of Hillrom's anti-competitive practices as they assess entry into the Relevant Markets. The fact that a former competitor such as KCI chose to exit the market even after securing a $250 million settlement from Hillrom is a significant deterrent to any new entrant considering similar entry.

160. New entrants also face steep challenges in convincing lenders and financers that Hillrom's anti-competitive practices won't drive them out of business as it has so many others who have attempted to compete with the Hillrom juggernaut.

161. The global pandemic has made this even more difficult because of its effects on the global economy and capital markets worldwide, which has resulted in restricted access to capital, increased financing costs, and greater concerns about liquidity and creditworthiness.

*Hillrom's Longstanding Relationships and Exclusive Dealing*
*Agreements with Top IDNs*

162. Hillrom's long-term, exclusive dealing agreements with top IDNs serve as an additional and critically important barrier to entry. As explained more fully below, Hillrom's long-term, exclusive dealing agreements with IDNs foreclose new entrants from competition and significantly narrow the portion of the market available to a new entrant, often leaving competitors free to feed only on the crumbs that fall from Hillrom's table.

163. The highly concentrated nature of the IDN distribution channel, coupled with Hillrom's long-term, exclusive dealing agreements, exacerbates this barrier to entry. Many IDNs that have relationships with Hillrom are unwilling to even consider a competitor's products

because purchases thereof would jeopardize their relationship with Hillrom and likely subject them to negative economic consequences imposed by Hillrom.  As such, the protectionist nature of Hillrom's deals turns the usual bidding process on its head and bars new entrants from even getting a foot in the door.

164.     Without the ability to compete for the majority of customers, competitors cannot achieve the economies of scale necessary to effectively compete in the U.S. market.  This, in turn, functions as an additional barrier to entry in the Relevant Markets.

165.     The IDN distribution channel has also been a particularly difficult channel for new vendors to enter, often requiring vendors to invest heavily in a large sales force in order to obtain consideration from IDNs.  Relationships with IDNs depend on building and maintaining a strong relationship.  These relationships often take years to build, as IDN leadership and member medical institutions must learn about and trust a new entrant's products.   Hillrom devotes extensive resources to maintaining its relationships with IDNs, and its monopoly profits finance a sprawling network of sales professionals who are laser-focused on maintaining these relationships and keeping new competitors out through long-term, exclusive dealing agreements.

*Standardization, the Incumbency Advantage,*
*and Switching Costs*

166.     Hillrom's monopoly power is also protected by the unique market dynamics of the Relevant Markets, which provide Hillrom with a strong incumbency advantage due to the desire for standardization where possible and exceedingly high switching costs for customers to transition away from their installed base of hospital beds.

167.     Generally, all else being equal, many individual hospitals prefer to standardize the type of beds that they purchase and use to treat patients, if possible.  Standardization allows individual hospitals to train doctors and nurses on only one system, which in turn maximizes

efficiency. Doctors and nurses can then move among departments within a hospital based on that local hospital's needs. Hospitals also seek to minimize the number of vendors they purchase from to reduce administrative costs. But, at the same time, standardization is not always feasible for a variety of reasons. For example, an IDN created through consolidation of multiple hospital systems may have a mixed installed base of hospital beds across the system.

168. It is typical for individual hospitals to replace beds on a piecemeal basis. Hospitals typically replace one unit or section of beds at a time, rather than all beds at once. This means any new beds purchased will be used alongside the beds the hospital previously purchased. This acts as an additional barrier to entry, as hospitals take compatibility and consistency with their current inventory into account when selecting bed vendors, which in turn creates a strong incumbency advantage.

169. These market dynamics are exacerbated by the longevity of the hospital beds. Generally, the life cycle of a hospital bed is 10-15 years. Opportunities to compete for hospital bed sales are therefore infrequent and staggered, and conducted in a piecemeal fashion, thereby augmenting the incumbency advantage.

170. Individual hospitals invest substantial time and money into learning to use an incumbent's beds and creating training materials to educate their employees. As a result, hospitals take into account potential costs of retraining or lost efficiencies when considering whether to switch suppliers, even if the new supplier has a better product or service or lower price point. The significance of these switching costs acts as an additional barrier to entry for suppliers looking to compete in the Relevant Markets.

171. The products that individual hospitals use to treat patients are also increasingly inter-connected and, as such, the associated switching costs typically must include consideration

of the cost to replace any technologically-connected products that would need to be switched out if the bed was switched out. This greatly augments the total switching costs and, as explained more fully below, Hillrom has exploited this barrier to entry by implementing a "Connected Care" strategy designed to increase these costs to a level where it would be cost-prohibitive for hospitals to switch to competitors.

172. For these reasons, Hillrom itself repeatedly boasts that its installed base is "sticky."

173. These unique market dynamics—standardization, the incumbency advantage, and incredibly high switching costs—serve to increase the minimum market share needed to compete effectively in the Relevant Markets.

174. These effects are strongest at the individual hospital level. As IDNs increasingly consolidate, the individual member hospitals within an IDN often have legacy relationships with different suppliers in the Relevant Markets. For example, if two hospital systems merge to create an even larger IDN, one of the legacy hospital systems may be a "Hillrom house" and the other may have a legacy installed base of non-Hillrom beds. As such, IDNs may need to contract with multiple vendors at the system level to accommodate the mixed installed base of its legacy hospital systems and the associated individual hospitals. But, at the level of individual hospitals within an IDN system, the unique market dynamics described above influence their purchasing decisions. In other words, even though a contract award at the system level may be "dual" or "multi" source, this typically does not mean that there is competition. Instead, it is simply a recognition of the fact that individual hospitals within an increasingly consolidating IDN system may have different installed bases and the IDN thus needs to accommodate their pre-established buying preference because of the unique market dynamics described above.

38

*Hillrom's Intentionally Closed Digital Platform Ecosystem*

175.     Individual hospitals are required under federal law to install a nurse call system, which is hard-wired into hospital beds and rooms.  Federal law requires that these nurse call systems send a series of basic signals from the bed to the nurse station.  Within the last decade, nurse call system manufacturers have added enhanced features that permit additional information to be collected and transmitted.  This information includes real-time data like bed position and the use of other bed features that help hospitals predict and prevent negative patient outcomes.  For example, a hospital that has predictive data showing that patient falls are more likely to occur with a certain bed position can use this information at the point of care to adjust beds in real time and optimize patient safety. These systems are also capable of interfacing with the hospital's digitized electronic heath record ("EHR") system to collect and record relevant data points.

176.     The EHR industry (also referred to as an electronic medical record, or "EMR"), is a $27.8 billion industry in the U.S. Individual hospitals spend millions on their EHR systems.  EHR integration enables the flow of healthcare data, like patients' personal information, allergies, medications, and diagnosis history, within an individual hospital and a broader hospital system.  Further, connecting medical devices to an EHR system gives caregivers immediate access to accurate patient information, which can help improve clinical decision-making and patient safety.

177.     Because hospitals invest heavily in EHR systems, medical equipment integration with EHR systems is an increasingly requisite feature for suppliers' medical devices and hospital products.  Similarly, because hospitals often have different pieces of equipment made by different suppliers within the hospital room and at the nurse station, the health care industry standard is interoperability.

178.     Hillrom's nurse call system is called NaviCare and offers advanced features like those described above.  Hillrom, however, does not permit non-Hillrom beds to use any of the advanced features.  That is, Hillrom intentionally blocks the safety and efficiency benefits of a modern nurse call system if a hospital chooses to use non-Hillrom beds.

179.     Hillrom is the only nurse call provider that limits the availability of its advanced features based on the bed supplier.

180.     Nurse call systems are hefty investments for hospitals, and have a lifespan of roughly 30 years, or two bed-replacement cycles.  Hospitals that install NaviCare are thus locked up by Hillrom for 30 years of either using Hillrom beds, or using competitor beds and foregoing the full features and benefits of purchasing NaviCare.

181.     It is cost-prohibitive for a hospital to remove and reinstall a non-NaviCare nurse call product to allow non-Hillrom beds to communicate with the hospital's EHR system.  Such a hospital would not only need to purchase a new nurse call system but also would likely need to pay to rip the existing NaviCare hard wiring out of its floors and walls.  Such expense is cost-prohibitive.

182.     This barrier to entry will be exacerbated now that Baxter has acquired Hillrom.  Baxter manufactures other durable medical equipment, such as infusion pumps, which are used in the hospital room, and related consumable supplies.  Handing control of the digital platform ecosystem built by Hillrom over to Baxter will result in even greater incentive to use the technological connection as a chokepoint to lock out competitors in other product markets.

183.     Indeed, Baxter and Hillrom have already publicly discussed ominous-sounding plans to integrate their product offerings and expand the technical integration strategy to move away from "being a products company" into collectively becoming "a comprehensive solution

partner." Since Hillrom is the only competitor in the Relevant Markets that adopts a closed-system approach, rather than allowing interoperability, this strategy will only tighten its stranglehold on the Relevant Markets and serve as an additional barrier to entry.

*Hillrom's Patents and Aggressive Patent Enforcement*

184.    Intellectual property is yet another barrier new entrants must deal with as they contemplate entering into the Hospital Bed market.  Incumbents are very protective of the intellectual property and technology of their bed systems.  And even if an incumbent does have a pioneering product, it must invest time and resources into protecting the pioneering features of its product by obtaining its own intellectual property rights.

185.    Hillrom has 135 bed and bed-related products with hundreds of associated patents. For example, Hillrom's latest bed offering, the Centrella Smart+ Bed, has more than 50 patents associated with the bed alone.  Plus, Hillrom has patents for various bed-connected items, like surfaces that reduce pressure points, and connected information technology products, like WatchCare, designed to alert caregivers to incontinence.  Hillrom's proprietary nurse call system, NaviCare, likewise has more than 55 patents.  Hillrom has filed at least one patent associated with the connected NaviCare system that allows the smart beds to update within the network.  This large number of patents means that it takes more time for competitors to innovate and find different ways to accomplish their objectives and features.

186.    Hillrom has a history of aggressively enforcing its patents.  Even if an incumbent believes it has a truly unique product, there is always a risk that its rollout will get entangled in contentious litigation as Hillrom seeks to protect its market position.  Patent lawsuits that tie up the rollout of key products have the potential to be major barriers and even a death knell to potential entrants.

187.    Hillrom has repeatedly sued and threatened to sue competitors in the Relevant Markets for violating their patents, often without basis.

188.    Hillrom's aggressive bullying strategy is apparent from a recent lawsuit against Stryker that has lasted several years, *Hill-Rom Services, Inc. v. Stryker Corporation*, No. 1:11-cv-1120 (S.D. Ind.).  Hillrom sued Stryker for infringing its patents for systems and methods for enabling hospital personnel to remotely monitor the status of hospital beds.  The case settled after a long, drawn-out litigation battle, but during the fight, the Patent Trial and Appeal Board determined that some of Hillrom's hospital bed patent claims were properly rejected by the USPTO (*Stryker Corp. v. Hill-Rom Services, Inc*., Order of Oct. 14, 2014, Lebovitz, R.).

189.    Hillrom likewise sued competitor Huntleigh Healthcare LLC in 2010 related to its Centrella Smart+ beds and bed lifting and positioning technology, among other claims, *Hill-Rom Company, Inc., et al. v. Huntleigh Healthcare LLC, et al.*, No. 1:10-cv-00767 (S.D. Ind.).  The parties settled in 2011.

190.    Hillrom's patents and its aggressive patent enforcement strategy serve to protect Hillrom's installed base in the Relevant Markets by erecting barriers to entry for any potential new entrants.

*The GPO Administrative Fee*

191.    A new entrant into the Relevant Markets needs to be able to secure contract status with at least one of the four remaining national GPOs, which are used by an estimated 98% of U.S. hospitals, to be able to sell the Relevant Products in the United States.  Without the "hunting licenses" that GPOs provide, a new entrant will not be able to sell to the vast majority of hospitals and other health care providers in the United States.

192. To even obtain consideration from the four remaining national GPOs, new entrants need to invest heavily in a large sales force. Relationships with GPOs depend on building and maintaining a strong relationship between the vendor and the GPOs. These relationships often take years to build, as IDN/GPO leadership and member medical institutions must learn about and trust a new entrant's products.

193. The GPOs also are set up as a "pay to play" structure. In order to obtain contract status with GPOs, all vendors must pay an administrative fee—often referred to as the "GPO tax" —that equals about 1.75-2% of a customer's purchase volume on average. This "GPO tax" collected from vendors is the primary funding mechanism for GPOs and, as such, GPOs have a significant incentive to maximize the amount of the fee. The payment of the tax, however, is the only way to secure contract status with the GPOs (and thus the necessary hunting license for sales to member hospitals).

194. For new vendors, GPOs typically demand that they pay higher administrative fees to the GPO than large vendors like Hillrom. For example, Linet has been forced to pay an average administrative fee of between 3 and 3.5% to secure GPO contract status, well above the industry average.

195. This "GPO tax" on new entrants eats into the profit margins of smaller manufacturers—essentially, because GPOs know that new entrants need the "hunting license" the GPOs provide, they demand higher fees—and this creates an additional barrier to entry for vendors who wish to compete with Hillrom on the merits. Since Hillrom's market power allows it to negotiate a lower GPO administrative fee, it has a built-in financial advantage over smaller vendors in selling to member hospitals, which makes it even more difficult for new vendors to enter the market.

196.    Many smaller manufacturers cannot afford to pay administrative fees, let alone higher administrative fees, so the fees effectively deny them access to a critical mass of providers to buy their products.  For this reason, many prominent industry observers and antitrust scholars have commented that vendor-paid fees increase the likelihood of anti-competitive exclusive dealing arrangements.

197.    Indeed, the U.S. Congress has historically been concerned about the GPO distribution channel as a barrier to entry.  In 2002, for example, members of Congress raised concerns about GPO business practices, including the collection of excessively high administrative fees, sole-source contracting with dominant vendors, and limiting customer access to new and innovative technology.    Several subsequent Government Accounting Office reports have highlighted similar concerns, as have the *Freedom Medical* and *UHS* lawsuits against Hillrom for its specific practices with GPOs.  While several GPOs have adopted codes of conduct that reformed some of these practices, including limiting the use of sole-source contracts, reducing administrative fees, and addressing conflicts of interest such as receipt of gifts and entertainment from vendors, GPOs still typically demand higher administrative fees from new entrants than dominant firms such as Hillrom.

*The Regulatory Regime Applicable to Medical Equipment*

198.    The Relevant Products are all Class II medical devices subject to regulation by the U.S. Food and Drug Administration ("FDA").

199.    New entrants must go through the arduous and costly process of registering their products and obtaining compliance with rigorous FDA rules and regulations before they can sell products in the Relevant Markets.

44

200.    After registration, the FDA has the authority to inspect production facilities without notice and may issue warning letters or take other disciplinary action for non-compliance, including shutting down the establishment.  As such, hospital bed manufacturers in the Relevant Markets must maintain certain records over time to substantiate compliance and the costs associated with such compliance efforts acts as a further barrier to entry.

201.    Hospital bed manufacturers have also traditionally been subject to an excise tax of 2.3% on medical devices.  While this tax was suspended in 2016 and repealed in 2019, it was in place from 2012 to 2016 and served as an additional barrier to entry to new entrants at that time. The possibility that an excise tax may be revived serves as an additional barrier to entry today.

## HILLROM'S ANTI-COMPETITIVE CONDUCT IN THE RELEVANT MARKETS

### Linet Enters the U.S. Market and Begins to Threaten Hillrom's Dominance with Better Products and Lower Prices

202.    In 2009, the Affordable Care Act was enacted amid rising concerns about healthcare costs.  At the time, Hillrom's monopoly power was still at its apex and the Relevant Markets were characterized by high costs, poor service, and a lack of innovation.

203.    Customers had grown frustrated with Hillrom's aggressive behavior.  For example, in the *Spartanburg* case, a nationwide class of hospital customers accused Hillrom of abusing its monopoly by submitting only bundled pricing across multiple categories and insisting on exclusive dealing in exchange for significant rebates across the bundle.  These significant rebates were a lie, as Hillrom offset any discounts it offered by hiking up its prices to a supracompetitive level.  The customers claimed that this conduct was motivated by an exclusionary and anti-competitive purpose because it was not economically feasible to refuse to accept the Hillrom bundle, which forced them to do business exclusively with Hillrom.  While Hillrom ultimately agreed to pay its customers $337.5 million to resolve these monopoly maintenance claims, an important part of the

settlement was an injunction prohibiting Hillrom from engaging in such practices from 2006-2009, which briefly opened up the market to legitimate competition.

204.    As the leading supplier in Europe with a reputation for innovation and affordable prices, Linet was uniquely situated to enter the U.S. market.  Nonetheless, because of Hillrom's reputation for anti-competitive behavior, it was cautious and engaged in an extended and careful study of the market before deciding to enter.  Ultimately, Linet saw an opportunity to be a market disruptor that provided the solution to cash-strapped hospitals long frustrated by Hillrom's dominance.

205.    To that end, Linet decided to expand into the U.S. in 2010.  Linet's then-President and CEO Colin Bain said the timing was ideal "because of the push for health care reform" and "the struggling economy, which has made hospital budgets tight, despite a steady demand."

206.     From the start, the centerpiece of Linet's strategy was to use its innovative bed technology and affordable pricing to secure new business.  According to Bain, "we think it's going to really disrupt the market in a very positive way for hospitals."  For example, the company's user-friendly technology made it possible for a single nurse to deliver care—a significant benefit amid a then-pending nursing shortage, and one that Hillrom's beds could not match.  Linet's superior technology, including the ability to tilt beds at the push of a button and smart-screen technology, was likewise unmatched.  At the same time, Linet priced its products significantly below Hillrom's monopoly-inflated price, thereby providing customers with a truly cost-effective alternative to Hillrom for perhaps the first time.

207.    To effectuate this strategy, Linet adopted a five-year plan and projected that it would achieve $100 million in total sales and approximately 12% share in the Relevant Markets. The five-year plan included expansion of the work force to 150 employees and investment in the

establishment of a manufacturing operation near its headquarters in the Charlotte, North Carolina region.

208.    In May 2011, Linet unveiled its revolutionary new ICU Bed at the National Teaching Institute & Critical Care Exposition in Chicago, Illinois.  The latest generation ICU Bed, developed in collaboration with a clinical advisory panel of over 150 nurses from 6 different countries, allowed Linet to bring proven, innovative technology to the U.S.  In addition to offering one of the best warranties in the industry, Bain emphasized that "Linet products are known for their low cost of ownership," and that the new bed technology would "follow our same value-oriented economic proposal for hospitals."

209.    Initially, Linet's launch went exactly as planned.  In June 2011, just one month after launch, Linet was selected by one of the largest GPOs, Premier, to showcase its innovative technology as part of a national program—the Innovation Celebration—focusing on innovation and performance improvement in healthcare.  Premier President Mike Alkire noted that Linet's technology had "the potential to substantially impact the safety, quality and cost-effectiveness of care."

210.    Linet soon reported that revenue was up 200% for fiscal years 2011-2012.  "Right now," Bain was quoted, "we are really hitting our stride."

211.    As a result of widespread clinical and market approval of its products, Linet quickly secured contract status with the then-largest GPOs in the U.S., including Amerinet and the U.S. Government (VA/GSA).   Then, in December 2012, Linet announced an agreement with HealthTrust, a large GPO whose membership included the nation's largest hospital system, HCA, as well as 1,400 non-profit hospitals and over 10,600 surgery centers, physician practices, and

alternate care sites. One month later, in January 2013, Linet announced an agreement with Premier, which represented 2,700 hospitals and 90,000 other health care sites at the time.

212. With these GPO "hunting licenses" in hand, Linet was also able to go to market and win business with several major IDNs.

213. Linet was well on its way towards achieving its goals. Indeed, Linet was able to relatively quickly gain approximately 5% of annual sales of the Relevant Products and all signs were pointing toward future progress.

214. In February 2013, a high-level delegation of business and government leaders from the Czech Republic visited government officials in Charlotte, North Carolina, celebrating Linet as a "USA success story."

215. When it entered U.S. market, Linet believed it would be able to compete fairly on the merits and that customers offered a choice between Linet and Hillrom's products would choose Linet, just as customers repeatedly had done in competitive markets in Europe over the last two decades. This choice would, in turn, help customers assuage growing concerns with rising healthcare costs and reinforce the ACA's goal of making healthcare affordable to everyone.

216. The strength of Linet's products is their clinical following. Doctors and nurses simply view Linet's products as superior to others on the market. Hospital administrators also appreciate Linet's attractive pricing and the significant savings it provides when compared to Hillrom at the product level.

### The Hillrom Empire Belatedly Recognizes the Threat Posed by Linet and Decides to Strike Back

217. Hillrom did not originally perceive Linet as a threat and was dismissive of its younger, more innovative rival. After all, no company had ever truly challenged Hillrom's

dominance before in the way that Linet did. But as Linet quickly realized success, Hillrom came to recognize the existential threat that Linet posed to its core business.

218.     Hillrom's entire business model has always been premised on its longstanding ability to use its monopoly power in the Relevant Markets to leverage into other, adjacent markets, especially other products and services needed for the operation of hospital rooms. If Linet were able to disrupt the Relevant Markets and pose a viable threat to Hillrom's monopoly, Hillrom knew that its time-tested leveraging strategy would collapse, thereby bringing down the entire Hillrom empire like a house of cards.

219.     Hillrom had seen this type of nascent competitive threat before, however, and knew exactly how to use its monopoly power to crush it in incipiency.

220.     By the time Linet entered the U.S. market in 2010, the injunction secured by Hillrom's customers in the *Spartanburg* litigation had expired, leaving Hillrom free to once again resume the same anti-competitive practices that it had used previously. While Hillrom no doubt recognized that the resumption of such conduct posed a significant risk of liability, its emergence from a decade of litigation with its monopoly intact had convinced Hillrom that it was more profitable to pay out sizable settlements than allow a nascent competitor offering superior products and lower prices to gain a foothold in the Relevant Markets. Hillrom executives saw such payouts as simply the cost of doing business.

221.     Hillrom knew it could not compete with Linet on price at a product level or in the clinical trials with doctors and nurses that precede customer purchasing decisions. Instead, Hillrom hoped to stop Linet's expansion in its tracks by leveraging its relationships, installed base and dominant market power, or at least throw up enough roadblocks so that Linet could never achieve sufficient economies of scale to serve as a true competitor to the Hillrom dynasty.

222.    As always, Hillrom played to its strengths.  Its greatest strength was its installed base and what Hillrom liked to publicly characterize as its "stickiness."  Leveraging the associated monopoly power was a proven way for it to squash nascent competitors.  Hillrom therefore devised an anti-competitive strategy with this recognition at its core to prevent Hillrom from losing any more market share to its promising younger rival.

223.    Hillrom's strategy to combat Linet was multi-faceted.  Hillrom devised a variety of anti-competitive conduct—some old, some new—that it stirred into a "monopoly broth" that collectively would allow it to achieve its goal.  But the predominant means by which Hillrom has suppressed competition and foreclosed Linet from the Relevant Markets is through the creation of a new type of strategic overlay agreement that bore a remarkable resemblance to the same type of agreement that its customers challenged in *Spartanburg.*

## The Advent of the "Corporate Enterprise Agreement"

224.    The primary and most important prong of Hillrom's anti-competitive strategy was to coerce the largest IDNs in the U.S. into confidential, long-term, exclusive dealing contracts covering the Relevant Products known as "Corporate Enterprise Agreements."  These agreements were essentially the same type of agreement that customers condemned in *Spartanburg*, but were repurposed by Hillrom to focus on the vital IDN distribution channel and the specific threat posed by Linet.

225.    The CEA strategy was the brainchild of incoming Hillrom CEO John Greisch, who joined Hillrom from Baxter in January 2010, and an ultra-aggressive new sales team that Hillrom created specifically to target IDNs and dispose of the threat posed by Linet.  As Greisch later explained to investors, Hillrom "redeployed some sales resources into what we call our enterprise sales group, which is a team focused on some of the larger systems," and this new,

expanding team was charged with "leveraging the value of the breadth of our portfolio into the HCAs, the Ascensions, et cetera."

226.    At a J.P. Morgan Health Care Conference in January 2013, Greisch foreshadowed this strategy when he explained to investors that "[o]ne of the real strengths of the company that we're trying to leverage and we'll continue to leverage going forward is the market position that we enjoy, we've got over 70% install base market share in the acute care [bed] market, tremendous brand name and very, very strong market presence and brand equity within the acute care and post-acute care markets here in the United States and overseas."

227.    Greisch recognized that Hillrom's market power created an enormous strategic lever that Hillrom could use to increase its market share in all of the Relevant Markets by offering customers anti-competitive deals that bundled the breadth of its portfolio in a way that nobody else could match.  In other words, while being careful not to say so directly, or to share any incriminating details, Greisch came to believe that Hillrom needed to recycle the very strategy that led to the *Spartanburg* settlement with its customers.  Given the threat posed by Linet to Hillrom's core business, Greisch felt like Hillrom had no other choice.

228.    Consequently, between 2013 and 2014, Hillrom assembled its "strategic sales" team to study how best to undercut Linet's success by using its existing market power as leverage and doing whatever it took to prevent Linet from winning any more customers.

229.    Ultimately, Hillrom determined that the only way it could stop Linet was by using its entrenched monopoly to lock up IDNs with confidential, long-term, exclusive dealing agreements before Linet was able to gain a foothold with the largest and most important customers in the U.S.  This effort was led by Hillrom's Matt Crane, who acknowledges on LinkedIn that he "developed and validated new strategies to form enterprise accounts team" and

led the "pilot to pursue IDNs under new structure and strategy." Crane worked closely with Hillrom's Bryan Risner, who likewise boasts on his LinkedIn page that he "pioneered the first IDN centric solution sales blueprint for the Strategic Partnerships team." Both worked in conjunction with senior Hillrom management.

230.    At this point, Linet had successfully gained contract status with the major GPOs and, even though Hillrom tried repeatedly, it knew that it would be difficult to dislodge Linet entirely from contracts that were already awarded.

231.    By adopting an IDN-focused strategy, however, Hillrom knew that it could render Linet's GPO contract status moot. GPO contracts were just "hunting licenses." Hillrom's IDN-focused strategy would ensure that the prey had already been caught and tied up by the time Linet could even use its newly won licenses to start hunting. And, because IDNs often influence GPOs, Hillrom knew that it could then use the IDNs to ultimately oust Linet from the GPO distribution channel as well, thereby killing two birds with one stone and ensuring that all avenues to hospital customers were closed.

232.    Hillrom also targeted IDNs for this lock-up strategy because it recognized that they were increasingly able to influence customers' purchasing decisions and thus the ideal pressure point to exert its leverage. Indeed, in public statements, Hillrom itself acknowledged that "IDNs and health systems often make key purchasing decisions and have influence over the GPO's contract decisions." What Hillrom did not disclose was that it was Hillrom itself that was driving this change for its own gain.

233.    Hillrom's anti-competitive strategy was straightforward. If it could lock up the top IDNs with exclusive agreements, Hillrom recognized that it would control all of their member hospitals as well. Many IDNs have centralized supply chain functions within the

corporate parent entity. This structure provides Hillrom with a lever to drive contract compliance, even if an individual hospital within an IDN would prefer to purchase Linet's superior products at the lower product-level price.

234. Hillrom knew that it could not compete with Linet at the product level on either price or quality. IDNs typically contract for the Relevant Products separately. But, if Hillrom competed with Linet on the merits in each Relevant Product category, it would run the risk of being swept across all categories. When customers were given the choice, Hillrom knew that many customers would choose Linet. So Hillrom knew that it was necessary to go over the heads of doctors and nurses participating in the bed procurement process and appeal directly to senior IDN executives and supply chain directors more focused on the system-wide bottom line for all product categories sold by Hillrom.

235. With its back against the wall, Hillrom resolved to find a creative way to use its installed base to push Linet out of the market. The critical insight underlying Hillrom's strategy was thus to link all of an IDN's buying decisions together and offer substantial rebates in exchange for a confidential agreement to engage in long-term, exclusive dealing. By bundling all of an IDN's purchasing decisions together, Hillrom could take advantage of its installed base, the unique market dynamics outlined above, and its broad portfolio of products to avoid product-level competition with Linet altogether. In essence, Hillrom was betting that resorting to its old tactics would trump Linet's "best of breed" products and pricing.

236. While GPOs and IDNs typically contract for products by category to avoid antitrust concerns, Hillrom recognized that it could not compete head-to-head on either price or quality at a product level. The CEAs were therefore designed to bundle and link together *all* of

the purchasing decisions by hospitals within an IDN in numerous distinct product markets, including the Relevant Products, into a single overarching agreement with a collective rebate.

237.    Because this was a reincarnation of the same strategy that led its hospital customers to bring the *Spartanburg* litigation, Hillrom knew that it needed to disguise the true nature of the CEAs and conceal them from public scrutiny.  For example, Hillrom knew it could not simply include all of the anti-competitive terms in a single agreement as it had done in *Spartanburg*, so instead it devised a contracting strategy in which its agreement with IDNs were made to look like multiple, independent product-level agreements, but which Hillrom secretly tied together using the CEAs as a strategic overlay.  As a practical matter, they were still "one agreement" and the effect was the same as the agreements at issue in *Spartanburg*, but Hillrom believed that this contrived obfuscation would help insulate itself from liability.

238.    Hillrom knew that it would not be easy to coerce IDNs into long-term term exclusive deals covering the Relevant Products.  Because top IDNs have grown so large through consolidation of pre-existing hospital systems, individual hospitals within an IDN have different baseline needs or may have standardized on different products.  Thus, to coerce IDNs into agreeing to the CEAs, Hillrom realized that it needed to make IDN administrators a so-called Godfather offer—a coercive offer too good for any rational IDN to refuse—in which it conditioned exorbitant rebates on an IDN's willingness to enter into long-term, exclusive dealing agreements.  This was the only way to compel administrators to override the wishes of their doctors and nurses and the more attractive product-level pricing that Linet was offering for better products.

239.    Hillrom's team thus christened CEAs as its response to Linet's early market success.  Hillrom assessed that, as a producer of multiple products, it could coerce IDNs into

secret, long-term exclusive dealing agreements by conditioning rebates on purchases across multiple different product lines that a "best of breed" producer in any single product category, like Linet, could not match. This, Hillrom reasoned, was the only way to stop the threat that Linet posed to its core business.

240. Hillrom initially targeted the largest health systems in the country, including the single largest IDN, HCA, and a series of other top IDNs, such as Providence Health, Universal Health Services, and Cleveland Clinic. Matt Crane led these efforts and "executed a plan to target" these specific IDNs and geographies.

241. Hillrom's test-drive of its new anti-competitive campaign was successful.

242. In 2014, Hillrom announced that it had entered into long-term, exclusive dealing agreements with one of the largest GPOs, HealthTrust, and two of the nation's largest hospital systems, HCA and Providence Health. In each of the IDN agreements, Hillrom was able to coerce the IDNs into a long-term, exclusive dealing agreement to purchase all Standard Hospital Bed, ICU Bed, and Birthing Bed products from Hillrom for a duration of five or more years. For all practical purposes, these agreements are perpetual, however, and remain in effect today.

243. The HCA deal came first. In June 2014, Hillrom publicly announced its exclusive dealing agreement with HCA, the nation's largest health system, as part of a comprehensive modernization program across the HCA system. While the announcement has now been scrubbed from Hillrom's website, and very little details were provided, Hillrom CEO Greisch later reminded investors at a quarterly earnings conference that the HCA deal was "multi-year," covered "capital" purchases of the Relevant Products, and was "sole-source" with Hillrom. Greisch was careful, however, to avoid any mention of the fact that Hillrom had used a CEA to secure the deal.

244. Three months later, in September 2014, Hillrom publicly announced a stunningly long, exclusive dealing agreement with Providence Health, the nation's third largest not-for-profit health system, that lasted for seven years and included all of the Relevant Products. At the time, Providence was one of the largest health systems in the U.S. and Hillrom stated that it was "excited to transition to an exclusive partnership in a category as important as capital bed frames and surfaces." Once again, Hillrom failed to mention that it had used a CEA as a strategic overlay to secure the deal.

245. The terms of both of these agreements were striking for their sharp departure from industry norms and customers' expressed preference for product-level competition. For example, while the average duration of most IDN agreements was one to three years, Hillrom was able to extend its hold over customers significantly further in these precedent-setting deals. Indeed, the Providence deal was ***more than double*** the length of any prior IDN deal and effectively locked up the nation's third largest not-for-profit health system for nearly three quarters of a decade.

246. Hillrom viewed the HCA and Providence deals as a successful beta test and, indeed, both deals sent tremors throughout the U.S. hospital bed industry. For example, then-Hillrom CEO John Greisch celebrated the boost that these agreements would provide to Hillrom and emphasized that Hillrom had a "high appetite" to continue to "really leverage the position we've got in the hospital systems." He explained that "how we leverage the position we have with our customers on the back of the strength of our bed franchise is what excites us as we look forward." What he didn't say, however, was how he was doing that. Greisch knew those details needed to be kept secret.

247.    The advent of the CEAs—and the covert resuscitation of the anti-competitive conduct that sparked the *Spartanburg* litigation brought by its customers—led to enormous returns for Hillrom.  Indeed, Greisch boasted that 2014 was "one of the most successful years in our Company's history."  This was despite the fact that he acknowledged two of Hillrom's most significant customers and largest IDNs in the country, HCA and Ascension, had reduced spending over the past year.  Nonetheless, Greisch felt confident that those customers would be spending more capital on Hillrom product going forward, because "***locking them in*** with the contracts that we've got, I feel very good about our position there."

248.    By the end of 2014, Hillrom CEO Greisch was so confident in his CEA strategy that he began ominously predicting that IDNs were going to want to deal with "fewer suppliers" going forward.

249.    Hillrom's sales team was richly rewarded for their "whatever it takes" approach. According to his LinkedIn profile, for example, Bryan Risner was rewarded with Hillrom's Outstanding Contribution Award for locking Linet out of HCA and obtaining "the largest single year committed buy ever delivered."

250.    Hillrom thus resolved to build on the success of its anti-competitive CEA strategy.  The pilot program evolved into what Hillrom now calls its "Enterprise Accounts" organization.  Hillrom's Enterprise Accounts, as described by Matt Crane, encompasses sales, marketing, and informatics teams covering the top 35 IDNs in the U.S., with 60 full-time employees and an annual operating budget of $17 million as of 2019.  Hillrom has since continued to funnel even more resources in its Enterprise Accounts team.  For example, after the COVID-19 pandemic resulted in layoffs, Hillrom's new CEO John Groetelaars told investors that part of the $50 million in savings generated would be put into the Enterprise Accounts

organization to further drive its CEA strategy and "take advantage of the broader portfolio that we bring to the marketplace."

251.     Since its record-setting year in 2014, Hillrom has continued to execute on its anti-competitive strategy with other major IDNs.  Indeed, by the end of 2016, Greisch told investors at a JP Morgan Healthcare Conference that Hillrom was now a "significant partner" with "every major IDN in North America," and admitted that it was still trying to "leverage" its portfolio with customers around the world because of the "stickiness" of its products.  Once again, however, Greisch was careful to keep the details secret.

252.     As its CEA contracting strategy continued to lock up more and more of the market, Hillrom continued to expand its strategy and tout its success.  Bryan Risner, Vice President of Enterprise Accounts, boasts on his public LinkedIn profile that Hillrom secured "committed contracts for seven largest deals in history of company's business segments" via a "corporate agreement" between 2017 and 2019 that included "all contracted products with HCA," including rental offerings, smart beds and furniture, clinical IT solutions, and EMR connected vitals-sign devices.  The deal's value, according to Risner, exceeded $500 million.

253.     Similarly, in the first quarter of 2021, Hillrom's new CEO John Groetelaars announced the "single largest deal that the company ha[d] ever done as part of one contract" with "one of the top three largest hospital systems in the country."  Groetelaars explained that the deal encompassed a range of products, including NaviCare, Hillrom's mobile communications platform, and other integrated medical devices.  Groetelaars, like Greisch before him, carefully avoided any discussion of how these deals were won.

254.     Since the advent of its CEA strategy, moreover, Hillrom has consistently insisted on strict contract compliance and threatened IDNs with consequences if they do not accede to

Hillrom's demands. Hillrom's sales force extensively monitors IDNs and, if it discovers that an IDN spoke with Linet or other competitors, Hillrom resorts to intimidation and other tactics until the IDN agrees to cease all communications with competitors. If a hospital official complains about Hillrom's "strong arming" tactics or being tired of opening up their checkbook and having Hillrom tell them what to write, they are quickly silenced. As a practical matter, IDNs have no choice but to accede to such bullying—once they sign a CEA, Hillrom has near complete power and control over them.

## HILLROM'S CORPORATE ENTERPRISE AGREEMENTS ARE ANTI-COMPETITIVE

255.    Hillrom's CEAs possesses all the hallmarks of anti-competitive exclusive dealing agreements.

256.    Indeed, the CEAs are simply a different flavor of the same type of arrangement that Hillrom's customers challenged as anti-competitive in the *Spartanburg* litigation, with two significant modifications.

257.    First, the CEAs target IDNs, rather than GPOs, because Hillrom recognized that the IDNs increasingly control purchasing decisions and drive contract compliance. The GPOs, by contrast, merely dealt "hunting licenses" and, given prior litigation and government scrutiny, Hillrom knew it would be harder to displace Linet from GPO agreements.

258.    Second, Hillrom adopted a multi-contract strategy with separate product-level agreements connected together via the strategic overlay of the CEAs. Hillrom knew that coercing IDNs into a single agreement would be problematic in light of the *Spartanburg* litigation, so it chose this contracting strategy intentionally as a way to disguise the true nature of its long-term, exclusive dealing agreements with IDNs. As a practical matter, however, all of the agreements

are connected together by the CEAs as part of "one agreement" and are thus essentially the same contractual structure as in *Spartanburg*.

259.    Hillrom has substantial market power in the Relevant Markets, with more than 70% installed base in each market.  As described above, this installed base is "sticky" because of the unique dynamics of the Relevant Markets.

260.    The CEAs induce IDNs to agree to confidential, long-term, exclusive dealing agreements covering the Relevant Products that force IDNs to purchase all of their requirements from Hillrom or, alternatively, agree to an ironclad commitment to purchase a very high percentage—often exceeding 80-90%—of their requirements from Hillrom, which operate as *de facto* exclusive dealing agreements.  As a practical matter, the effect on competition of an 80-90% commitment is tantamount to 100% because of the unique market dynamics of the Relevant Markets.

261.    The predominant mechanism of exclusion in the CEAs is the exclusivity provisions.

262.    Hillrom knew that the CEAs would strongly incentivize customers to achieve 100% commitment and that it could drive compliance by monitoring and pressuring IDNs to discipline their members accordingly.  Hillrom thus coerced IDNs to ignore the preferences of their own member hospitals for non-Hillrom products.  An individual member hospital within a "committed" IDN that wanted to use Linet products would be forbidden from doing so because of Hillrom's leverage over the IDN at the system level.

263.    For all practical purposes, Hillrom's CEAs ensure that IDNs are coerced into agreement and compliance with "committed" exclusive dealing contracts to purchase all or nearly all of their requirements for the Relevant Products from Hillrom through an overarching incentive and enforcement structure.

264. The primary purpose of the CEAs is to obtain exclusive dealing agreements covering the Relevant Products and to maintain and strengthen Hillrom's monopoly position and eliminate competition. Because Hillrom is already a monopolist in the Relevant Markets, the exclusivity provisions are especially damaging to competition.

265. As a dominant manufacturer faced with the prospect of losing market share to a younger rival in Linet, Hillrom's CEAs are designed to slow Linet's expansion and deprive it of the minimum economies of scale necessary to compete. The delay in Linet's growth caused by Hillrom's conduct results in consumer harm because hospitals are deprived of choice and forced to pay higher prices for inferior products.

266. In fact, because of Hillrom's anti-competitive conduct, Linet has not achieved the economies of scale that it had expected. As a result, Linet has been forced to slow its expansion plans in the U.S. and postpone indefinitely plans to build a manufacturing facility in the Charlotte, North Carolina region.

267. The exclusivity provisions engendered by the CEAs are not justified by any legitimate economic or business rationale.

268. Exclusive dealing agreements covering the Relevant Products do not provide IDNs or their member hospitals with any efficiency gains. All the benefits of the exclusive dealing agreement are in favor of Hillrom.

269. Hillrom uses its monopoly power to coerce IDNs into accepting Hillrom's demand that the IDNs' exclusively deal with Hillrom and no other competitor.

270. The impetus for the exclusive dealing provisions in the CEAs was Hillrom. IDNs did not ask for Hillrom to impose exclusivity requirements and, but for Hillrom's coercion, would prefer not to "commit." Competition reliably results in lower prices and greater innovation,

improving consumer welfare. Indeed, the *Spartanburg* case was brought by customers to prevent Hillrom from engaging in such practices and, but for the Godfather offer presented to them by Hillrom, customers would never agree to such deals.

271. Customers know that refusing to agree to Hillrom's demands would risk being penalized by Hillrom and jeopardize its relationship with Hillrom going forward. Hillrom knows that customers rely on its service network of 140 service centers and about 1,200 service technicians throughout the U.S. to provide quick coverage when a bed needs repair, and uses that "strong point" in its favor to strong-arm customers into "partnering" with Hillrom. Any customer that resists Hillrom would therefore run significant risks, including putting in question the ability to secure replacement beds or service from Hillrom on its existing beds. Consequently, losing Hillrom as a supplier is not an option for customers, particularly those customers where Hillrom has a majority of the installed base and hospitals have invested millions of dollars in capital equipment with a long useful life.

272. As a practical matter, neither IDNs nor their member hospitals are free to walk away from Hillrom's CEAs if another competitor offers a better price for the Relevant Products. Indeed, Linet does, in fact, offer superior pricing as well as technologically superior products.

273. The key to Hillrom's strategy was to take choice away from individual hospitals, represented by doctors and nurses on staff, and to capitalize on a difficult economic climate by coercing hospital executives, purchasing agents, and administrators into signing deals with Hillrom even though at the clinical level hospitals preferred Linet's superior products and lower prices.

274. Hillrom's agreements are made directly with the corporate parent entity of an IDN, which exerts ownership and control over individual hospitals within the IDN.

275.    Hillrom relies on the IDN corporate parent to drive contract compliance and require individual hospitals within the system to purchase Relevant Products from Hillrom.  Hillrom assigns sales representatives from its Enterprise Accounts team to monitor IDNs and their member hospitals to ensure contract compliance.  When Hillrom learns that an individual hospital may be interested in evaluating hospital bed products from another supplier, Hillrom informs the IDN corporate parent that it has committed to purchasing Hillrom products and that it is the IDN's obligation to ensure that hospitals within the system purchase Relevant Products from Hillrom.

276.    Hospitals prefer to purchase products that are superior in design, less expensive, and tailored to that hospital's unique needs.  Hospitals also prefer the chance to evaluate competitor product offerings and learn about maintenance services provided before making capital purchases.  On several occasions, hospitals have told Linet that, although it won the clinical trial portion of an RFP, it lost the contract owing to a decision made at the IDN—and not local hospital—level.  But no IDN or hospital has publicly acknowledged having acceded to Hillrom's CEAs because Hillrom contractually prevents them from disclosing the terms of its anti-competitive agreements.

277.    Hillrom's CEAs and exclusive dealing product agreements with IDNs therefore bind member hospitals against their preference.  As a result of this policing and enforcement system, individual hospitals within an IDN committed to Hillrom cannot give competitors like Linet a chance to demonstrate the value of their products, and thus Hillrom's competitors are excluded from any opportunity to make sales within an IDN that has exclusively committed its purchases to Hillrom on a long-term basis.

278.    For example, one hospital customer within an IDN committed to Hillrom held an extensive clinical evaluation pitting Linet against Hillrom and other competitors.  Linet won the evaluation, and the hospital purchased Linet's beds, giving Linet very positive feedback.  Other

hospitals in the same system likewise indicated that they wanted to purchase Linet products. However, when Hillrom got wind that a hospital had purchased Linet beds, Hillrom pushed the IDN corporate parent to enforce its exclusionary contract, and the other hospitals ultimately were forced to purchase Hillrom beds, even though they preferred Linet.

279.    In addition, the CEAs reinforce committed contracts by ensuring that an IDN cannot achieve its maximum rebate unless the hospitals within the system purchase all of their requirements for the Relevant Products from Hillrom. Because the Relevant Products are the most expensive products in the bundle covered by the CEAs, Hillrom strategically sets the rebate levels under the CEAs so that the spend on the Relevant Products contributes the greatest amount to a customer's rebate potential across the bundle. As a result, unless a customer agrees to purchase all or nearly all of its requirements for the Relevant Products from Hillrom, a customer would sacrifice CEA rebates on not just the Relevant Products, but also on other, unrelated products sold by Hillrom. Viewed another way, customers who choose not to purchase 100% of the Relevant Products from Hillrom are faced with an across-the-board price increase on *all* products they buy from Hillrom.

280.    The conditional discounts and rebates offered by Hillrom are designed to leverage the breadth of Hillrom's portfolio of beds and other standalone pieces of equipment. As one analyst put it to Hillrom's CEO at the Morgan Stanley Healthcare Conference in 2014, "I don't think any company in medical devices has more breadth than [Hillrom] without the depth." The CEAs thus ensure that it is impossible for any competitor in the Relevant Markets which does not manufacture a similarly broad line of products to demonstrate how offered savings could offset the rebate potential on other products with Hillrom. Indeed, the discounts and rebates are so steep that even a competitor offering its hospital beds for free would not be able to attract business away

from Hillrom considering the bundled package it offers. Thus, even equally (or more) efficient competitors are denied the opportunity to compete against Hillrom's bundled pricing scheme. Further, Baxter's acquisition of Hillrom enhances Hillrom's product bundle to include the full line of Baxter products.

281. The CEAs were structured and intended by Hillrom to be both long-term and nearly impossible to terminate.

282. Hillrom's CEAs with IDNs effectively last in perpetuity and create long-term supply agreements with IDNs in the Relevant Markets, far longer in duration than is necessary to accomplish a lawful purpose.

283. The term of a typical GPO or IDN product-level agreement is one to three years. This duration is sufficient to accomplish the twin goals of giving the customer a price it can rely on for a substantial amount of time without needing to constantly renegotiate while also providing the supplier with a reasonable end date for its price commitment to allow for consideration of changing conditions and other circumstances in future pricing.

284. Hillrom's CEAs are intended to significantly extend the standard industry term for product-level agreements by locking in IDNs to purchasing Hillrom products for five years or longer, which increases the customer's dependency and likelihood of renewal. In combination with the CEAs, long-term "committed" product agreements translate into a perpetual agreement because IDNs often stagger their purchases, the Relevant Products have a long useful life, and the unique market dynamics create massive switching costs. So long as the CEA remains in place, the customer's commitment is perpetual.

285. To date, there is no known instance in which an IDN signed a CEA with Hillrom, but subsequently terminated it and switched to a competitor's bed products.

286. Hillrom's IDN agreements are illogical but for their anti-competitive effect. Perpetual exclusive dealing agreements depress competition and do not have valid business justifications.

287. If Hillrom were the provider of choice for a customer, it would not need to prevent that customer from buying from other suppliers through a contractual exclusivity provision because customers naturally prefer to standardize. The only reason for an exclusive dealing agreement is to lock up a customer that might prefer to buy one or more of the Relevant Products from other suppliers, so that standardization, switching costs, and entrenched brand preferences can take hold and create a lifelong customer not based on the merit of the products, but rather based on the coerciveness of the agreement. Indeed, the very fact that Hillrom as a monopolist needed to resort to coercive CEAs to keep its customers is powerful evidence that Hillrom itself recognized that customers would otherwise prefer Linet's products if given the choice.

288. The CEAs, moreover, are even longer term in practical effect. Indeed, these rebate agreements are generally renewed as a matter of course. Once an IDN is covered by a CEA and commits to a purchase a significant percentage of its beds from Hillrom, it has strong incentive to continue to purchase additional beds from Hillrom. The consequences of stepping back from a CEA are an across-the-board price increase. Similarly, 70% of all U.S. hospitals' capital investment in hospital beds is tied up in Hillrom products that must continually be maintained and serviced in a timely manner in order to be usable and safe, so IDNs fear the consequences of angering Hillrom. Accordingly, once Hillrom secures a CEA with an IDN, it effectively means that IDN is closed to competition for at least the useful life of the beds purchased over the duration of the CEA and likely far longer.

289.   Hillrom typically times the introduction and imposition of CEAs to when IDN customers are nearing a replacement cycle or purchasing a large volume of new beds to outfit newly expanded or acquired facilities.  For example, with HCA, Hillrom implemented its new contracting strategy just as HCA was commencing a "med-surg modernization program" whereby it planned to replace 25,000 Standard Hospital Beds system-wide.  Based on that effort, Bryan Risner delivered "the largest single year committed buy ever delivered" in company history worth $40 million.  Because the product life of the Relevant Products is between 10-15 years, if an IDN purchases bed products at the time it enters into the CEA, as is typically the case, the CEAs can potentially exclude rivals for at least 10-15 years or longer.

290.   IDN corporate parents create budgets for capital expenditures based on the prices listed in their agreement with Hillrom.  The agreement's quoted prices depend on the IDN's compliance with the contract, including the exclusivity and minimum purchase requirements.  The longer the duration of the agreement, the greater the dependency and reliance on the promise of future low prices.  Thus the potential financial penalties in terms of foregone savings create a powerful incentive for the IDN parent to force its individual hospitals to stick to the agreement with Hillrom.  Meanwhile, Hillrom looks for ways to increase the price of its products above what is quoted in its customer agreements.  Hillrom has been known to quote "de-featured" or bare bones beds to show a favorable price that entices hospital supply chain and procurement administrators to award the contract to Hillrom.  But those beds lack the functionality and technology needed at the clinical level, therefore the price paid by the hospital customer forced to buy from Hillrom is often much higher due to various options and add-ons that are required for patient care and provider safety.

291.    Moreover, Hillrom's high installed base, especially in IDNs where it has secured exclusive agreements for purchase of Relevant Products, create powerful effects that render any termination provision in the agreement effectively meaningless.

292.    Hillrom's CEAs were unprecedented at the time that they were introduced by Hillrom.  Before Hillrom introduced the CEAs to combat Linet, no other participant in the Relevant Markets used CEAs in the IDN distribution channel.

293.    There are no other competitors in the Relevant Markets that use CEAs the way that Hillrom does.

294.    The effect of Hillrom's CEAs is to substantially lessen competition in the Relevant Markets.

295.    There are no other significant distribution channels that would allow Hillrom's competitors to sell to IDNs or their member hospitals once Hillrom has obtained exclusivity. Merely securing GPO contracts is inadequate because those contracts are "hunting licenses" and do not translate into sales to IDNs or individual hospitals. The importance of the IDN distribution channel, moreover, is rapidly increasing as consolidation within the industry accelerates.

296.    Hillrom's CEAs have foreclosed Linet from competing for business in a substantial and growing share of the Relevant Markets.

297.    Linet conservatively estimates that Hillrom's CEAs and committed agreements now foreclose Linet from at least 50% of the Relevant Markets.  In the Standard Hospital Bed market, Hillrom's CEAs and committed contracts cover an estimated 57% of the market.  In the ICU Bed market, Hillrom's CEAs and committed contracts cover an estimated 50% of the market.  In the Birthing Bed market, Hillrom's CEAs and committed contracts cover an estimated 50% of the market.

298. The actual amount of foreclosure is not publicly available. After the *UHS* litigation was filed in 2015, Hillrom stopped issuing press releases when it signed exclusive deals with IDNs to avoid further scrutiny and further tightened up the secrecy surrounding CEAs. Indeed, the contrast between Hillrom's public boasts about the HCA and Providence Health deals and its current silence evidences consciousness of their anti-competitive nature and a desire to conceal its effects.

299. Hillrom knows the CEAs are anti-competitive and expose the company to significant risk. As such, it recognized the need to disguise their nature and conceal them from public scrutiny. For example, Hillrom knew it could not simply include all of the anti-competitive terms in a single agreement as it had done in *Spartanburg*, so instead it concocted a contracting strategy made up of multiple product-level agreements, tied together by the Corporate Enterprise Agreement as a strategic overlay. As a practical matter, they were still "one agreement" and the effect was the same, but Hillrom believed that this contrived obfuscation would help insulate itself from liability. In addition, Hillrom also insisted on strict confidentiality clauses with its customers backed by contract provisions full of teeth in order to prevent IDN customers from revealing the existence, let alone the terms, of their CEAs with Hillrom. Finally, although Hillrom repeatedly issued press releases and spoke openly about its customers wins, it has never once publicly acknowledged the existence of the CEAs.

300. Indeed, Linet has approached its potential customers repeatedly after losing a bid to Hillrom to conduct due diligence on why Linet was not successful, only to be met with silence and unreturned calls. Typically, the industry custom is to provide a losing bidder with an opportunity to learn why their proposal was not accepted. Hillrom has prevented IDNs from

speaking with Linet, however, and further intimidated them to the point that they are afraid to say anything to Linet.

301.    The substantial degree of foreclosure is amplified by Hillrom's strategy of targeting IDNs which are the largest and most important customers in the industry.  Capturing the top IDNs enhances Hillrom's market power by impairing competitors' ability to act as a meaningful constraint through offering better pricing and more innovative products to the most influential health systems in the U.S.  It also makes it far more likely that smaller IDNs will follow the top IDNs in agreeing to CEAs.  If smaller IDNs resist Hillrom, they will be unable to compete themselves with the top IDNs because Hillrom will impose a higher cost structure on them for the same essential products.

302.    The intent of Hillrom's exclusive dealing agreements is to eliminate competition in the Relevant Markets by depriving customers of choice, locking them in to buying only from Hillrom and locking out other competitors like Linet.  The effect of Hillrom's anti-competitive conduct is to block smaller or potential competitors from competing for sales to the affected customers and deprive competitors of an opportunity to gain economies of scale by shutting off the largest customers, thereby resulting in higher prices and inferior products available to the market as a whole.

303.    If Hillrom's conduct continues, Linet believes that Hillrom could achieve nearly complete market foreclosure as it continues to invent new ways to maintain and enhance its market power in the Relevant Markets, to the detriment of competitors and customers alike.

## HILLROM STIRS OTHER ANTI-COMPETITIVE CONDUCT INTO ITS MONOPOLY BROTH

304.    The long-term exclusionary provisions in the CEAs are the predominant means by which Hillrom is able to suppress competition and exclude Linet from the Relevant Markets.  But

Hillrom also engaged in a variety of other conduct that augmented the anti-competitive effects of the CEAs, including acquiring new companies to expand the power of the bundle, constructing a closed digital connectivity architecture and conditioning its full value on the exclusive use of Hillrom products, threatening customers with economic repercussions, and disparaging Linet and its products.

### Hillrom's Strategy for Expanding the Power of the CEAs Through Acquisition

305.    Hillrom's CEA strategy evolved over time.  Once it became clear that its anti-competitive scheme to lock up the largest customers would work, Hillrom expanded the scope of its ambitions.  Indeed, over the past 6-7 years, Hillrom has gone on an acquisition spree, intensifying its anti-competitive practices by subjecting more and more products in the hospital room to its coercive bundling and exclusive dealing strategy, and thereby increasing the barriers to competitive entry in the Relevant Markets.  After its recent acquisition by Baxter, Hillrom now intends to expand the scope of its anti-competitive activities even further, thereby forcing more and more competitors across multiple product lines out of business.

306.    For its CEA strategy to work, Hillrom recognized that it needed to create even more coercive pressure on IDNs to keep them locked in to Hillrom's ecosystem of products going forward.

307.    Hillrom recognized that the power of the Godfather offer it presented IDNs, and thus its ability to coerce IDNs into long-term exclusive dealing, was dependent on the volume of rebates it was able to promise them.  The greater the number of products that are subject to the CEAs, the larger the rebate and the more powerful the coercion that Hillrom can exert over IDNs to demand exclusive dealing.

308.    Hillrom thus strategized that it needed to grow, with an eye towards "owning" the entire suite of products within a standard hospital room.

309. To accomplish this goal, Hillrom invested the ill-gotten gains from its monopoly bed business into acquiring other adjacent products in order to fill the entire hospital room with an ever-increasing portfolio of Hillrom-branded equipment.

310. Hillrom thus commenced a campaign to snap up other companies that had developed promising technologies and equipment to build out its portfolio offering before they, like Linet, could become "best of breed" competitors to Hillrom. Since Hillrom beds were already installed in 70% of hospital rooms, and its CEAs were powerful means of exclusion, Hillrom knew that its salespeople would have a natural advantage in their ability to access customers, leverage the Hillrom brand, and cross- and up-sell the newly acquired products.

311. Since the early 2000s Hillrom has aggressively moved to pursue acquisitions of other products that augment its CEA contracting strategy and eliminate actual and nascent competitors. Key purchases include:

| Date | Acquisition | Business |
|------|-------------|----------|
| 2003 | NaviCare Systems (minority) | Operations management, resource optimization and dynamic workflow solutions for health care enterprises |
| 2003 | Advanced Respiratory | Non-invasive airway clearance products and systems |
| 2004 | NaviCare Systems (full) | Operations management, resource optimization and dynamic workflow solutions for health care enterprises |
| 2004 | Mediq | Medical equipment outsourcing, asset management and peak-needs rentals to the health care industry |
| 2008 & 2011 | Liko | Patient lifts and assistive technology |
| 2012 | Volker | Long-term and acute care bed frames, surfaces and furniture |
| 2012 | Aspen Surgical Products | Surgical consumable and specialty medical products |
| 2014 | TRUMPF Medical | Operating room (OR) infrastructure products |
| 2015 | Welch Allyn | Care diagnostics and testing |

| 2016 | Tridien Medical | Medical therapeutic support surfaces and patient positioning devices |
| 2017 | Mortara Instrument | Diagnostic cardiology and patient monitoring solutions, technologies and devices |
| 2019 | Breathe Technologies | Wearable, non-invasive ventilation technology (Life2000® Ventilation System) |
| 2020 | Videomed | Integrated video solutions in operating rooms |
| 2021 | Bardy Diagnostics | Ambulatory cardiac monitoring technologies |
| 2021 | EarlySense | Contact-free, continuous monitoring solutions for the healthcare continuum |

312.    Outside of buying out competitors to Hillrom's existing beds and mattresses business, such as the acquisitions of Mediq, Volker, and Tridien, Hillrom's clear focus has been to purchase companies that produce standalone pieces of healthcare equipment that are complementary to its core bed offering. As the analyst put it, the portfolio Hillrom has assembled together is wide but not deep.

313.    For example, in 2015, Hillrom bought Welch Allyn for $2.05 billion. Welch Allyn's equipment allows physicians to carry out diagnostic tests in point-of-care settings, such as at a hospital bed, without having to wheel patients around. At a subsequent Hillrom Investor Conference, CEO John Greisch predicted that the acquisition would result in significant growth "driven by taking our newly expanded portfolio to customers through our strong enterprise selling relationships."

314.    Notably, whenever it made an acquisition to add a new product, Hillrom emphasized that one of the rationales was that it could include the products in its corporate enterprise deals and leverage those to greater effect. Hillrom called this the "One Hill-Rom approach." But Hillrom was careful to never reveal the details of these deals or how it was using the portfolio to "drive" the deals. Hillrom knew that it faced significant antitrust liability if those details ever came to light.

315.    Hillrom's success with its CEA contracting strategy fueled a desire to do more and more acquisitions to increase its ability to coerce IDNs into CEAs.  As then-CEO John Greisch put it to investors in 2015, "[t]he rest of our portfolio and how we leverage the position we have with our customers on the back of the strength of our bed franchise is what excites us going forward."  Indeed, Greisch conceded that "the sense of urgency we have around rounding out and improving the portfolio is as high as it's ever been."

316.    Adding these new products created new opportunities for Hillrom to expand and maintain its monopoly over hospital beds.  Because no other bed manufacturer offered the same range of products, Hillrom offered bundled rebates on the customer's total equipment purchases from Hillrom.  As explained above, Hillrom's bundled rebates coerce customers into agreeing to "committed" contracts for purchasing hospital beds from Hillrom by forcing other bed suppliers to confront the impossible task of demonstrating how their savings offset the rebate potential with Hillrom.  The more products that Hillrom is able to include in the bundle, the more coercive power Hillrom holds over IDNs.

317.    More products in the bundle also set Hillrom up to achieve so-called "Transformation 2.0," according to Greisch in 2018, whereby Hillrom resolved to "differentiate" its hospital beds by creating an exclusive "closed loop" technological integration among products in its portfolio.  With a "closed loop," Hillrom can force customers who want to enjoy the benefits of other products in Hillrom's portfolio to purchase Hillrom beds by limiting interoperability of the peripheral equipment with beds made by other suppliers like Linet.

318.    The recently completed $10.5 billion Baxter-Hillrom deal significantly expands Hillrom's CEA strategy and exponentially increases its coercive power.

319. Prior to the deal, Hillrom had been contemplating moving into Baxter's core line of business—infusion pumps—as an adjacent market that would further augment its CEA strategy. An infusion pump is a medical device that delivers fluids, such as nutrients and medications, into a patient's body in controlled amounts. As such, it is typically used to treat patients while they are laying on their hospital bed.

320. As with the Welch Allyn deal, Hillrom's intent was to use its existing hospital bed monopoly to leverage its way into the market for other pieces of medical equipment commonly found in hospital rooms, especially as the COVID-19 pandemic created an increased demand for infusion pumps.

321. Previously, Hillrom purchased infusion pumps from Baxter as part of its expansion into the rental business, but it quickly determined that it was unprofitable to buy such products from Baxter and eventually exited it altogether. Instead, Hillrom aspired to own the more profitable manufacturing side of the business and incorporate infusion pumps and other equipment into its CEA contracting strategy in order to "optimize its portfolio."

322. Hillrom began foreshadowing this strategy publicly. Indeed, at a KeyBanc Capital Markets Life Sciences & Medtech Investor Forum in March 2021, Hillrom cited "infusion pumps," a product where Baxter is the market leader, as an example of the type of product that fit its strategy for integrating devices into Hillrom's closed ecosystem.

323. Four months later, on July 16, 2021, Baxter CEO Jose Almeida placed a phone call to Hillrom CEO John Groetelaars to express interest in an acquisition and alert him that a formal proposal would be forthcoming.

324. The timing was no coincidence. From Baxter's perspective, the acquisition of Hillrom was viewed as a "killer acquisition" and defensive merger intended to ward off future

competition from Hillrom just as the latter was contemplating an expansion into Baxter's core markets. The fact that a company as large as Baxter feared Hillrom's entry into its core line of business only serves to underscore the fear that Hillrom's history of bullying and willingness to engage in anti-competitive conduct instills in the marketplace.

325.    The parties announced the $10.5 billion deal on September 2, 2021. The announcement predictably emphasized that the parties now shared a "common vision" and that one of the key strategic rationales for the deal was the creation of a "strengthened portfolio with opportunity to accelerate" Hillrom's connected strategy and "expand penetration of combined solutions." At the same time, Hillrom CEO Groetelaars tellingly noted that the deal included a "significant and immediate premium" for Hillrom investors. The deal closed on December 13, 2021.

326.    The net effect of the deal will be to substantially lessen competition in the Relevant Markets even further (and to do so in other markets as well). It will significantly exacerbate the anti-competitive effects of Hillrom's existing conduct by creating a "super bundler" that holds enormous power over hospitals across multiple product lines, including the full suite of products that comprise the "smart" hospital room of the future. As Baxter itself noted in SEC filings, "no single company competes with us in all of our businesses," so there will be no company that can compete with the "super bundle" that the combined company will create. In addition, the deal will have cross-market effects, which will result in higher prices to hospitals and other healthcare providers.

327.    On October 20, 2021, Baxter and Hillrom disclosed that they received a warning letter from the Federal Trade Commission in which the agency reminded the companies that the agency could still challenge the planned merger even after closing.

**Hillrom's "Connected Care" Strategy to Augment the Strength of the CEAs**

328.    Hillrom has not been satisfied with simply coercing IDNs and other health care providers into long-term, exclusive deals with Hillrom on an ever-increasing bundle of products. Instead, Hillrom believes that it is necessary to go even further and ensure that several components of the products subject to the CEAs can only work as intended when used with other Hillrom products.   For example, as the infrastructure of hospital rooms increasingly involves "smart" technology, Hillrom has departed from industry interoperability standards and ensured that its systems are closed to competitors.

329.    Hillrom designed its care communications platform in a way that full functionality depends on the hospital purchasing other Hillrom products, especially hospital beds.  In Hillrom's vision, hospital beds, including the Relevant Products, act as the digital "hub" of the hospital room. Dubbed its "connected care" strategy, Hillrom uses this artificially closed system design to foreclose competitors in the Relevant Markets and force hospital purchasers to stay within the bundle.

330.    Hillrom's strategic pivot toward this technological integration strategy culminated in the launch of its Centrella Smart+ bed in 2017.  Centrella integrated Hillrom's NaviCare Patient Safety application and allowed Hillrom to market Centrella together with nurse call as a "combined ecosystem."   Centrella is now the only Standard Hospital Bed offered for sale by Hillrom.

331.    Nurse call systems have existed for decades, and work through 37-pin connector cables that connect hospital beds to a communications system.  Hospital beds are required by law to have nurse call systems that meet industry-developed criteria initially developed in 1977.

Today, nurse call systems must provide basic functions including bells to call a nurse into the room, two-way communication via a push-and-talk system, and bed exit alarms.

332.     Within the last decade, nurse call system manufacturers have added enhanced features that permit additional information to be collected and transmitted.  This information includes real-time data like bed position and the use of other bed safety features (i.e., whether siderails are up, whether a bed's brakes are set) that help hospitals predict and prevent negative patient outcomes.  With EHR integration and other features, the nurse call industry has ballooned into a $400 million industry.

333.     Nurse call systems involve hefty capital investments because they must be hard-wired into every room in the hospital.  These systems are expensive and intensive to install, costing millions of dollars.  The investment and roughly 30-year product lifespan of nurse call systems means that, once a hospital has selected a supplier, switching costs are enormous and thus prohibitive.

334.     Nurse call systems are also capable of interfacing with the hospital's EHR system to collect and record relevant data points.  Because they connect to every hospital room, nurse call systems also serve as a natural conduit to receive data from other common medical equipment, such as hospital beds, vital signs and cardiac monitoring devices, and medication delivery equipment like infusion pumps.

335.     Hillrom originally developed and expanded its nurse call platform with the completion of the acquisition of nurse call provider NaviCare Systems in 2004.  The trajectory of NaviCare's growth is difficult to track because Hillrom does not separately break out revenues and the product went virtually unmentioned in public statements until 2013.  However, in 2015,

Hillrom then-COO Carlyn Solomon commented that the company was "seeing a really nice growth" in the business just as Hillrom's CEA strategy was starting to take off.

336.     NaviCare now competes for the top spot in the nurse call market, boasting a rapidly increasing market share.  Indeed, at its current growth rate, it is likely that Hillrom will soon dominate the nurse call market in the same way that it dominates the hospital bed industry, thereby offering further confirmation of the ability of its CEAs to kill "best of breed" products in any of the categories subject to the CEAs.

337.     Manufacturers of "enhanced" nurse call systems typically provide universal compatibility with all manufacturers' hospital beds.  The purpose of universal compatibility is to ensure interoperability and allow a hospital to take advantage of all of the nurse call system's features, no matter what type of hospital bed is used.  This promotes customer choice and gives hospitals flexibility to have different kinds of beds connected to a single nurse call system.  It also enhances patient safety by allowing caregivers to utilize the full suite of enhanced features no matter the bed type within a hospital system.

338.     Hillrom views nurse call systems, however, as simply another means of exclusion. Unlike all other competitors in the nurse call industry, Hillrom has chosen to "close" its nurse call system and deny access to enhanced features of NaviCare for non-Hillrom beds.  NaviCare permits all beds to send and receive the basic signals required by federal regulations, but does not allow non-Hillrom beds to access enhanced features, including communication with EHR systems.  For example, Linet's beds are capable of communicating information such as whether the bed brakes are set, whether the bed is in the low position, and whether siderails are in the up and safe position. Giving health care providers remote access to this information is correlated with a reduction in patient falls and better outcomes.  Hillrom blocks competitor beds like Linet's from sending this

data through the NaviCare system, even though NaviCare has the ability to communicate such information.

339. A hospital's ability to use the full features of the NaviCare system is conditioned on the use and/or purchase of a Hillrom bed.

340. Hillrom has the technological capability to permit non-Hillrom beds to communicate information beyond basic information, including patient weight, bed status, and other alarm signals, via NaviCare, but chooses not to allow competitor beds to communicate this information.

341. There is no valid or technical reason why Hillrom disables the enhanced features of its NaviCare when it links to non-Hillrom beds.

342. Hillrom's choice is motivated by the fact that Hillrom is the only nurse call provider that also manufactures hospital beds. By contrast, Hillrom allows other medical equipment to connect to NaviCare if it does not compete with such products.

343. Hillrom falsely portrays the interoperability of its NaviCare system to customers. For example, Hillrom CEO Groetelaars has publicly emphasized NaviCare's ability to connect third-party products through a "universal gateway" and Hillrom's "commit[ment] to driving interoperability with our devices and other third-party equipment as well as integration into the EMR for data storage." Hillrom fails to disclose, however, that it intentionally prevents NaviCare interoperability and access to full features for any products that it perceives to be a threat to Hillrom's monopoly power, despite having the technology to permit such interoperability and access. The fact that Hillrom takes such actions against competitors—and only competitors—is powerful evidence that the conduct is intentionally designed to further foreclose such competitors from the Relevant Markets and thus protect its own monopoly position.

344.     Hillrom coerces hospitals to install NaviCare through the same CEA contracting strategy described above by adding NaviCare to the applicable bundle covered by the CEA.  As a practical matter, therefore, any hospital that has an installed base of Hillrom beds typically has no choice but to also use Hillrom for its NaviCare system or lose the coercive benefits provided by the CEA.  As such, hospitals are forced by Hillrom's CEA strategy to purchase additional Hillrom beds and NaviCare together as a bundle.

345.     Hospitals who have installed NaviCare face the choice of using only Hillrom beds or foregoing the advanced functionality offered by both the competitor bed and the NaviCare system.  A hospital that chooses the former is locked in to buy Hillrom beds for roughly 30 years, the lifespan of NaviCare.

346.     As a test case for this strategy, the launch of Hillrom's Centrella bed has shown exclusionary promise.  Centrella took what "used to be a flat market" in Standard Hospital Beds and expanded sales by $70 million.  Hillrom told investors that two-thirds of the sales growth from Centrella was due to changes in product mix, meaning that, in addition to selling increased numbers of units, Hillrom was also able to extract greater revenue per Standard Bed from its customers.

347.     Hillrom has doubled down on this strategy and labeled it the "Connected Care" vision.  Since launching Centrella, Hillrom has pursued acquisitions of software and communications companies to facilitate technological integration of all Hillrom products with its hospital bed.  Key acquisitions include its 2019 acquisition of Voalte, Inc. and Excel Medical Electronics and 2020 acquisition of Connecta Soft, S.A. de C.V., all of which provide communications and connectivity solutions.

348.    In a call to investors, Hillrom CEO John Groetelaars explained how the Connected

Care strategy has differentiated Hillrom's core product offering of hospital beds:

> We've been building for quite some time, a very differentiated platform on our bed
> business.  In fact, I would actually say we're turning the corner and it's really more
> of a patient monitoring and connected care system today. . . [g]iven all the
> technology and sensors and real-time communication capability that we've built
> into the system of the bed as a digital hub, the sensors and then the communication
> tools that surround it with our Care Comm and mobile communication business.

349.    Hillrom's strategic pivot to preventing interoperability with non-Hillrom products

relies on the fact that other competitors in the hospital bed market do not offer a similar range of

products and cannot quickly develop a rival to NaviCare.  Hillrom offers coercive financial

inducements for customers to install NaviCare based on the knowledge that Hillrom can count on

the customer buying its hospital beds from Hillrom for the next 30 years, which encompasses two

to three bed lifecycles.

350.    Hospital customers do not benefit from Hillrom's choice to lock competitors out

from NaviCare's advanced signals, nor do they ask for it.  In fact, one hospital has asked Hillrom

to do the opposite—permit Linet's beds to send advanced signals and EHR information through

its NaviCare system—because the hospital preferred Linet's bed offering but had already installed

NaviCare. Hillrom refused.

351.    Worse, some hospitals are not made aware that installing NaviCare pigeonholes

their subsequent hospital bed purchases.  Hospitals have told Linet they were unaware that Hillrom

did not permit competitor beds to communicate anything beyond basic information via NaviCare,

and since those hospitals had already installed NaviCare, they were forced to purchase Hillrom

beds to obtain the safety and integration benefits of the hospital's heavy investment in NaviCare.

352.    This confusion is understandable given Hillrom's misleading public statements.

When it purchased Voalte in 2019, Groetelaars told investors at the Bank of America Merrill Lynch

Health Care Conference that Voalte was a "communication tool that is essential to a part of a closed ecosystem – or closed loop ecosystem" it was building with NaviCare. He then walked back that Freudian slip, saying the system was "not . . . closed. It's a closed loop. It's going to be interoperable with other devices out there to really create this acute care ecosystem of real-time sensing, real-time communication . . . that caregivers get regarding the patient status." When it comes to competitors in the Relevant Markets, however, NaviCare is closed.

353.    By excluding competitor beds from access to NaviCare's enhanced features, Hillrom intends to and does exclude competitors from sales of the Relevant Products into hospitals.

354.    Linet has been told by several IDNs and hospitals that they could not purchase Linet's beds for lack of NaviCare compatibility, despite preferring Linet beds. And several hospitals that have installed NaviCare require advanced connectivity as part of their RFPs, a specification that only Hillrom can meet. For example, several IDNs and entities have issued RFPs where the specifications are tailored to Hillrom's beds, and one even used pictures of Hillrom beds. In such situations, the competition is a sham: Hillrom has already secured the contract in effect, as the RFP was written so that only Hillrom could meet its terms.

355.    As a result, even if customer hospitals prefer Linet's beds, their choice has been whisked away by Hillrom's anti-competitive conduct.

356.    Beyond NaviCare, Hillrom has built a comprehensive and integrated communications platform that unnecessarily excludes competitors in the Relevant Markets because the hospital bed serves as the communications "hub." Hillrom told investors in 2021 that it was "well positioned" to capitalize on its "differentiated ecosystem of smart beds and connected care solutions." Indeed, Hillrom announced the largest-ever IDN agreement in company history during the first quarter of 2021, a five-year deal worth hundreds of millions of dollars. This deal

encompassed NaviCare nurse call, connected devices, and also Hillrom's Voalte mobile application, which Groetelaars told investors "was a win across all those categories" and "integrated into [one] package." As a provider of both communications systems (like NaviCare) and products that send information via those systems (like hospital beds), Hillrom can leverage its refusal to permit full integration between its communications systems and competitor products, including the Relevant Products, to get IDNs and hospitals to agree to massive deals that otherwise would be characterized by competition at multiple levels to provide superior "best of breed" products with universal compatibility.

357.    Hillrom's Connected Care product strategy also contributes to the coercive effect of its agreements with IDN corporate parents. After an IDN has agreed to purchase effectively all of its requirements in the Relevant Markets for a duration of years, the IDN is more likely to purchase other Hillrom products that are promoted for their connectivity with Hillrom hospital beds and contribute to the overall rebate, creating a feedback loop that entrenches Hillrom even more.

358.    As Hillrom enters more bundled deals with hospitals and IDNs that force implementation of this closed, "end-to-end" system—hospital beds, NaviCare, and other integrated devices—Linet and other competitors will be foreclosed from more of the Relevant Markets.

359.    Hillrom's market-leading share of 30% of sales in the nurse call market means that Linet is already effectively foreclosed from access to a substantial share of hospitals in the U.S. because of the anti-competitive effects outlined above.

360.    The anti-competitive effects of Hillrom's Connected Care strategy are also likely to be exacerbated by its acquisition by Baxter.

361.    At a March 2021 KeyBanc Capital Markets Life Sciences & Medtech Investor Forum, Hillrom talked about how its connected communications system would allow it to select "good partners" for inclusion in the closed ecosystem. Baxter's increased ability to acquire potential competitors and power to exclude others from the platform built by Hillrom will only make matters more hazardous for medical equipment companies looking to sell into IDNs captive to Hillrom.

362.    The net outcome of Hillrom's Connected Care strategy is to expand and maintain Hillrom's monopoly in the Relevant Markets. Once Hillrom gets either a hospital bed or other medical device into the hospital suite, it can leverage its artificially closed system design to coerce IDNs and hospitals to secure the entire suite of products within the hospital room. Hospitals that want access to lifesaving medical equipment within Hillrom's expanding portfolio will have no choice but to buy Hillrom beds. Competition in the bed market will disappear and Hillrom's supra-competitive prices will only go up.

363.    Once again, the overriding goal of Hillrom's strategy is to eliminate competition and deprive customers—and especially doctors and nurses—of the ability to choose a better product at a lower price.

## Hillrom's Disparagement of Linet and its Products

364.    The final element in Hillrom's monopoly broth has been to supplement its anti-competitive conduct with product disparagement of Linet and its products.

365.    Hillrom deliberately spreads misinformation about Linet's hospital bed offerings to hospital customers. For example, a Hillrom representative told hospital customers that patients had fallen out of Linet's beds due to Linet's proprietary frame-based lateral tilt. A representative also falsely claimed that patients were stuck with the bed tilted, such that they had to be "rescued."

Another Hillrom representative continuously told nursing staff that Linet beds have a maximum capacity of 350 pounds. Others falsely stated that Linet's beds are made in a communist country with child labor. None of these claims are true.

366. Hillrom also tries to undercut Linet by spreading falsehoods about Linet's service. One representative, for example, told a hospital customer that Linet would not be able to service its products because the beds would have to be sent back to the Czech Republic, even though Linet had an established service location within 30 miles of the hospital. Another representative repeated this sentiment and added that Linet did not have replacement parts available as needed. Another told a hospital that Linet could not service its own beds because bed parts were always on backorder. Again, none of these claims are true.

367. Further, Hillrom representatives encourage hospital customers to ask Linet about locations where it has installed beds that work with NaviCare, a line of discussion intended by Hillrom to highlight that Linet cannot connect to NaviCare's advanced features. However, this limitation exists only because Hillrom blocks Linet's beds from connecting to NaviCare to the detriment of Hillrom customers, for the sole reason of carrying out Hillrom's intent to monopolize the Relevant Markets. In other words, Hillrom values damaging its competitors more than it values helping its customers use their equipment of choice to care for sick and dying patients in hospitals throughout the U.S.

368. These anti-competitive acts have no procompetitive justification, confuse purchasers, and evidence Hillrom's intent to monopolize the Relevant Markets. Indeed, these statements serve only to help Hillrom crush its smaller competitors like Linet.

## THE ANTI-COMPETITIVE EFFECTS
## OF HILLROM'S CONDUCT

369.    Hillrom's anti-competitive conduct has caused and will continue to cause substantial harm to competition in the Relevant Markets in the United States.

370.    The primary purpose of the exclusivity provisions in Hillrom's CEA contracting strategy is to strengthen Hillrom's monopoly position and eliminate competition.  Because Hillrom is already a monopolist in the Relevant Markets, the exclusivity provisions are especially damaging to competition.

371.    As a dominant manufacturer faced with the prospect of losing market share to a younger rival in Linet, Hillrom's CEAs are designed to slow Linet's expansion and deprive it of the minimum economies of scale necessary to compete.  The delay in Linet's growth caused by Hillrom's conduct results in consumer harm.

372.    Hillrom's anti-competitive conduct results in supra-competitive prices to hospitals and other customers.  Indeed, supply chain officials reported in fall 2021 that less competition among vendors increases hospital systems' cost of acquiring hospital beds.

373.    Market evidence establishes that competition in the hospital bed industry drives down prices.  In European markets, for example, the price of hospital beds is approximately 50-60% the price of beds in the U.S.  It is no coincidence that lower prices are consistently observed in markets in which Hillrom does not exercise market power and is unable to engage in the same type of anti-competitive conduct as it has in the United States.  If the Relevant Markets were competitive in the U.S., hospitals would likewise enjoy lower bed prices and better service.

374.    Hillrom's anti-competitive conduct has stymied innovation in the Relevant Markets and ensured that innovative, "best of breed" competitors cannot compete fairly with the Hillrom juggernaut.  By way of contrast, Hillrom itself has candidly admitted that it has little interest in

further innovation in the Relevant Markets. Indeed, Hillrom has publicly admitted that it was no longer interested in investing in research and development in the Relevant Markets. For example, on a July 2017 analyst call, former Hillrom CEO Greisch explained that, "historically, a lot of our R&D went into our bed franchise—into our bed portfolio. We're pretty much done with that investment." With its customers held captive, Hillrom no longer has to worry about investing in innovation to make its bed products competitive.

375.    But for Hillrom's anti-competitive conduct, customers would have access to innovative and technologically superior products at lower prices.

376.    Hillrom's anti-competitive conduct has resulted in a significant decrease in service and quality in the Relevant Markets.

377.    Hillrom's anti-competitive conduct has artificially restricted hospital bed capacity. For example, once Hillrom adopted its CEA strategy, it removed some of its Standard Hospital Bed products from the market, forcing cash-strapped hospitals to upgrade to its pricier Centrella bed by restricting their options going forward.

378.    Hillrom's anti-competitive conduct has prevented hospitals and other health care providers from being able to contract with Linet and other competitors to meet their needs during the COVID-19 global pandemic.

379.    Hillrom's anti-competitive conduct threatens the resiliency of the U.S. hospital bed industry at a time when adequate and affordable supply is more important than ever.

380.    Hillrom's anti-competitive acts and resulting foreclosure of the Relevant Markets affects prices and reduces quality for all hospitals. Hillrom's conduct therefore causes market-wide effects.

381.    Further, as the "hub" of its Connected Care strategy, Hillrom will continue to leverage its installed base of beds to obtain more NaviCare installations, and then leverage NaviCare to install more beds, and the cycle will continue.  Competitors will remain foreclosed from competing for sales into certain hospital systems because of Hillrom's refusal to allow non-Hillrom beds to interface with its communication equipment.

382.    Hillrom's merger with Baxter, a medical device manufacturing conglomerate, bolsters Hillrom's ability to steamroll competition.  Access to products that Baxter and its subsidiaries manufacture will swell Hillrom's bundled suite of products wrapped into CEAs, which exacerbates the suppression of rivals that do not manufacture the full range of products covered by the Hillrom/Baxter engine.

383.    If Hillrom's anti-competitive conduct is allowed to continue, Linet and other competitors will be substantially and quickly foreclosed from more and more of the market until Hillrom is able to eliminate substantially all competition.

384.    This negative effect on competition, and the degree of foreclosure in the Relevant Markets, will only become more pronounced in the future.  Hillrom recently told investors that it expects IDN "customers to become larger and more significant in terms of large, enterprise-wide purchasing decisions" and, if that prediction proves accurate, Hillrom's ongoing anti-competitive campaign will only serve to reinforce its monopoly in the Relevant Markets further.

385.    By reason of Hillrom's antitrust violations, Linet has sustained injury to its businesses and/or property, including lost profits and revenue that it would have realized but for Hillrom's unlawful conduct.  Linet has suffered significant damages as a result of Hillrom's intentional conduct.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## HILLROM'S CONCEALMENT OF ITS ONGOING
## ANTI-COMPETITIVE CONDUCT

386.    Linet did not discover Hillrom's anti-competitive conduct and could not have discovered through reasonable inquiry and the exercise of due diligence Hillrom's conduct and/or its injury until shortly before the filing of this Complaint.  Linet exercised reasonable due diligence in investigating its claims and preparing the Complaint.

387.    Hillrom's anti-competitive conduct was self-concealing insofar as it would not have been effective if it had been disclosed.  Indeed, because of the prior *Spartanburg* injunction and other antitrust litigation involving Hillrom, Hillrom knew that the resurrection of such conduct was anti-competitive and would immediately subject the company to massive liability if discovered.

388.    Consequently, Hillrom actively and fraudulently concealed its anti-competitive conduct from Linet and other competitors and customers, and prohibited affected customers from sharing any details that would alert others to Hillrom's conduct.

389.    Hillrom's CEAs and product-level agreements with IDNs are not publicly available.  Neither Linet nor any other competitor or customer has access to Hillrom's agreements with IDNs and has no means by which to discover the terms thereof.

390.    Hillrom intentionally structured its CEAs in a way that was designed to disguise the true nature of Hillrom's anti-competitive conduct and make it harder to detect.

391.    Hillrom insisted on strict confidentiality clauses in its CEAs that prevented IDN customers from revealing the existence, let alone the terms, of their long-term, exclusive dealing agreements with Hillrom.  Even today, Linet has little insight into the nature of these agreements because Hillrom still requires that the agreements remain secret.

392.    Hillrom also took active steps to prevent Linet from discovering the nature of Hillrom's conduct.  Indeed, Linet has repeatedly inquired and followed up with many customers to learn the reasons why it was not selected by IDNs through the RFP process, especially after it won the preceding clinical trial, but its efforts were only met with silence and unreturned phone calls.  The reason for this silence is because Hillrom muzzled customers and threatened them not to disclose the nature of their agreements with Hillrom or else they would be subject to default.  Hillrom also used threats and intimidation to eject Linet salespeople out of hospitals when Hillrom applied its pressure tactics so that Linet would have no way of discovering the backroom deals Hillrom was striking.

393.    While shielding Linet's (and other competitors' and customers') eyes, Hillrom has falsely attempted to create the public impression that the hospital bed market is competitive to avoid scrutiny.  Hillrom's financial disclosures falsely claim that Hillrom engages in competitive bidding and operates "in a highly competitive industry," and its leadership falsely claims that its IDN agreements are "competitive wins."  In addition, Hillrom's own publicly available Code of Conduct proclaims that it complies with the antitrust laws and achieves results "based on the quality of our products and our employees, never through unfair business practices."  But Hillrom has never publicly disclosed the existence of CEAs and/or the anti-competitive conduct that enabled it to secure such "wins."  It has always been careful to avoid any mention of the CEAs because it knew that it would be subject to immediate antitrust liability.

394.    The actual amount of foreclosure caused by the CEAs is not publicly available.  Hillrom proudly announced its big wins in 2014 with HCA and Providence without revealing any details.  However, after it was sued in 2015, Hillrom determined that it could better evade detection and avoid scrutiny by scrubbing its website and avoiding public announcements or statements

about the CEAs.  Hillrom's leadership even began referring to competitive wins generically, rather than by identifying the company by name, to avoid scrutiny.  For example, when Hillrom's new CEO John Groetelaars announced the "single largest deal that the company ha[d] ever done as part of one contract" in the first quarter of 2021, he refused to identify the IDN, instead only referring to it as "one of the top three largest hospital systems in the country."

395.    By virtue of Hillrom's active and intentional concealment of its anti-competitive conduct, the running of any applicable statute of limitations was tolled under the fraudulent concealment doctrine and the doctrine of equitable estoppel until within the last four years.

396.    Hillrom's anti-competitive conduct and active concealment is ongoing and continuing and, if not enjoined, will likely continue even after this Complaint is filed.

397.    Hillrom's anti-competitive conduct is a single, continuing violation of federal and state antitrust laws.

398.    Within the last four years, Hillrom has coerced IDNs into entering into new CEAs and/or renewing, extending or expanding existing CEAs.  Hillrom's new CEAs and renewal, extension or expansion of prior CEAs are new, overt, and independent acts that inflict new, continuing, and accumulating injury to Linet.

399.    Hillrom also entered into CEAs with IDNs more than four years ago that continue to have anti-competitive effects on competition in the Relevant Markets.  For example, because the terms of Hillrom's long-term, exclusive dealing agreements with IDNs customers cover only price and commitment, and do not fix the quantity, volume, or delivery schedule for the customer's future purchases under the contract, the anti-competitive effects of Hillrom's agreements are felt each time that an affected customer needs to purchase hospital beds and is forced to order beds from Hillrom.

400.    The amount of foreclosure caused by Hillrom's conduct exceeded the relevant threshold under the antitrust laws for the first time within the past four years.

401.    Hillrom has continually invested time and effort to enforce contract compliance on customers who have signed CEAs over the past four years.  Hillrom is known to "police" hospitals within an IDN or health system who solicit product demonstrations or bids from other hospital bed suppliers.  Hillrom seeks to maintain a constant physical presence in its customers' hospitals to allow for monitoring their relationships with other suppliers.  When Hillrom detects a potential defector, it uses strong-arm tactics to push the hospital or its corporate parent to comply with the contract.  Linet and other competitors and customers in the Relevant Markets are injured each time that Hillrom drove contract compliance by enforcing the anti-competitive terms of its CEAs with customers.

402.    Hillrom's has repeatedly attempted to augment the power of the CEAs through acquisition over the past four years, including through the recent Baxter acquisition.

403.    Hillrom has used its Connected Care strategy to prevent customers in the Relevant Markets from purchasing beds from Linet and other competitors over the past four years.  Hillrom's misleading statements about the interoperability of its NaviCare nurse call system and ongoing, deliberate choice to block competitors and customers in the Relevant Markets from connecting non-Hillrom hospital beds to Navicare has forced customers to deal with Hillrom against their will repeatedly over the past four years.

404.    Hillrom has disparaged Linet and its product offerings in the Relevant Markets through false and misleading statements to customers over the past four years.  Hillrom's statements disparaging Linet are new and independent acts intended to advance its overarching anti-competitive scheme to eliminate Linet as a competitor in the Relevant Markets.

405. Linet has suffered significant damages as a result of Hillrom's ongoing and continuing anti-competitive conduct.

## CAUSES OF ACTION

### COUNT I
**Monopolization or Attempted Monopolization of the Standard Hospital Bed Market in Violation of Section 2 of the Sherman Act (15 U.S.C. §2)**

406. Linet realleges paragraphs 1-405 as set forth above.

407. The market for the sale of Standard Hospital Beds constitutes a relevant product market and the United States is the relevant geographic market.

408. Hillrom possesses monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the market for the sale of Standard Hospital Beds in the United States. Barriers to entry and barriers to expansion by existing firms are high in this market. Hillrom, with at least a 70% share of installed base in the Standard Hospital Bed market in the United States, has the power to control prices and exclude competition in the market.

409. Hillrom willfully and wrongfully obtained and/or maintained its monopoly power, or has willfully, knowingly, and with specific intent attempted to acquire that monopoly power, by engaging in the exclusionary, anti-competitive conduct set forth in the preceding paragraphs of this Complaint.

410. Hillrom acted with specific intent to monopolize the Standard Hospital Bed market.

411. The predominant mechanism by which Hillrom excluded Linet from the Standard Hospital Bed Market is the long-term, exclusivity provisions in the CEAs.

412. Hillrom's long-term, exclusive dealing agreements in the Standard Hospital Bed Market are coercive, effectively perpetual, and nearly impossible to terminate.

413. The anti-competitive effects of Hillrom's conduct far outweigh any purported pro-competitive justifications. Similarly, there are no legitimate business justifications for Hillrom's

exclusionary conduct. To the extent that there are any legitimate business reasons for Hillrom's restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed pro-competitive business reasons for Hillrom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Relevant Markets.

414. Hillrom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving IDNs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

415. As a direct, foreseeable, and proximate result of Hillrom's exclusionary, anti-competitive conduct, Linet estimates that Hillrom's committed agreements now foreclose Linet from at least 50% of the Standard Hospital Bed market.

416. Linet has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

## COUNT II
### Monopolization or Attempted Monopolization of the ICU Bed Market in Violation of Section 2 of the Sherman Act (15 U.S.C. §2)

417. Linet realleges paragraphs 1-405 as set forth above.

418. The market for the sale of ICU Beds constitutes a relevant product market and the United States is the relevant geographic market.

419. Hillrom possesses monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the market for the sale of ICU Beds in the United States. Barriers to entry and barriers to expansion by existing firms are high in this market. Hillrom, with at least a 70% share of installed base in the ICU Bed market in the United States, has the power to control prices and exclude competition in the market.

420. Hillrom willfully and wrongfully obtained and/or maintained its monopoly power, or has willfully, knowingly, and with specific intent attempted to acquire that monopoly power, in the sale of ICU Beds by engaging in the exclusionary, anti-competitive conduct set forth in the preceding paragraphs of this Complaint.

421. Hillrom acted with specific intent to monopolize the Standard Hospital Bed market.

422. The predominant mechanism by which Hillrom excluded Linet from the ICU Bed Market is the long-term, exclusivity provisions in the CEAs.

423. Hillrom's long-term, exclusive dealing agreements in the ICU Bed Market are coercive, effectively perpetual, and nearly impossible to terminate.

424. The anti-competitive effects of Hillrom's conduct far outweigh any purported pro-competitive justifications. Similarly, there are no legitimate business justifications for Hillrom's exclusionary conduct. To the extent that there are any legitimate business reasons for Hillrom's restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed pro-competitive business reasons for Hillrom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Relevant Markets.

425. Hillrom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving IDNs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

426. As a direct, foreseeable, and proximate result of Hillrom's exclusionary, anti-competitive conduct, Linet estimates that it has been foreclosed from access to IDNs and hospitals accounting for at least 50% of the ICU Bed market.

427.    Linet has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

## COUNT III
**Monopolization or Attempted Monopolization of the Birthing Bed Market in Violation of Section 2 of the Sherman Act (15 U.S.C. §2)**

428.    Linet realleges paragraphs 1-405 as set forth above.

429.    The market for the sale of Birthing Beds constitutes a relevant product market and the United States is the relevant geographic market.

430.    Hillrom possesses monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the market for the sale of Birthing Beds in the United States.  Barriers to entry and barriers to expansion by existing firms are high in this market. Hillrom, with at least a 70% share of installed base in the Birthing Bed market in the United States, has the power to control prices and exclude competition in the market.

431.    Hillrom willfully and wrongfully obtained and/or maintained its monopoly power, or has willfully, knowingly, and with specific intent attempted to acquire that monopoly power, in the sale of Birthing Beds by engaging in the exclusionary, anti-competitive conduct set forth in the preceding paragraphs of this Complaint.

432.    Hillrom acted with specific intent to monopolize the Birthing Bed market.

433.    The predominant mechanism by which Hillrom excluded Linet from the Birthing Bed Market is the long-term, exclusivity provisions in the CEAs.

434.    Hillrom's long-term, exclusive dealing agreements in the Birthing Bed Market are coercive, effectively perpetual, and nearly impossible to terminate.

435.    The anti-competitive effects of Hillrom's conduct far outweigh any purported pro-competitive justifications.  Similarly, there are no legitimate business justifications for Hillrom's

97

exclusionary conduct. To the extent that there are any legitimate business reasons for Hillrom's restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed pro-competitive business reasons for Hillrom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Relevant Markets.

436. Hillrom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving IDNs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

437. As a direct, foreseeable, and proximate result of Hillrom's exclusionary, anti-competitive conduct, Linet estimates that it has been foreclosed from access to IDNs and hospitals accounting for at least 50% of the Birthing Bed market.

438. Linet has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

**COUNT IV**
**Unlawful Exclusive Dealing**
**in Violation of Section 1 of the Sherman Act**
**(15 U.S.C. §1)**

439. Linet realleges paragraphs 1-405 as set forth above.

440. Hillrom possessed (and currently possesses) market power in the Relevant Markets, including the market for the sale of Standard Hospital Beds, ICU Beds, and Birthing Beds in the United States. In each of the Relevant Markets, Hillrom has the power to control prices and exclude competition.

441. Each of the CEAs between Hillrom and IDNs nationwide that encompasses sales of Standard Hospital, ICU, and/or Birthing Beds to hospitals within that IDN is a contract, within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

442.     Each of the CEAs between Hillrom and IDNs nationwide that explicitly or implicitly requires member hospitals to purchase Standard Hospital, ICU, and/or Birthing Beds from Hillrom or forgo steep bundled discounts and rebates, and all of these agreements in total, have harmed competition in the Relevant Markets by thwarting Linet's and others' competitive entry and have caused injury to Linet's business and property, including increased costs, lost sales, lost profits, and diminution in business value, as described above.

443.     Each of the challenged agreements has had, or is likely to have, substantial and unreasonable anti-competitive effects in the relevant market, including:

a.     Depriving consumers of the benefits of competition among manufacturers of Standard Hospital, ICU, and/or Birthing Beds (including lower prices, innovation, and service improvements) by limiting or preventing Linet and other manufacturers in competition with Hillrom from participating in the RFP process, by which hospital staff review and evaluate various competitor beds, in critical hospital systems;

b.     Depriving consumers of the benefits of competition among manufacturers of Standard Hospital, ICU, and/or Birthing Beds (including lower prices, innovation, and service improvements) by limiting or preventing Linet and other manufacturers in competition with Hillrom by negotiating for and obtaining contracts for the sale of such beds in critical hospital systems;

c.     Unreasonably limiting entry or expansion by Linet and other competitors or potential competitors to Hillrom in the Relevant Markets;

d.     Raising the costs paid by hospitals that must purchase Hillrom Standard Hospital, ICU, and/or Birthing beds and concomitant maintenance service for the useful life of the beds, which is 10-15 years; and

e.    Depriving consumers of Standard Hospital, ICU, and/or Birthing Beds of the benefits of free and open competition.

444.    The procompetitive benefits, if any, associated with Hillrom's CEAs do not outweigh the actual and likely anti-competitive effects of the agreements.

445.    Hillrom's object, purpose, or intent in signing these agreements with IDNs is to unlawfully restrain trade in the Relevant Markets.

446.    Each of the contracts between Hillrom and IDNs nationwide that explicitly or implicitly forecloses member hospitals from purchasing beds in the Relevant Markets from any competitor other than Hillrom unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT V
### Unlawful Exclusionary Bundling
### in Violation of Section 3 of the Clayton Act (15 U.S.C. §14)

447.    Linet realleges paragraphs 1-405 as set forth above.

448.    Hillrom's use of exclusionary, bundled discounts in long-term, exclusive dealing agreements with IDNs, hospital systems, and individual hospitals incorporating monopoly products (i.e. Standard Hospital Beds) deprives hospitals of choice by effectively preventing them from purchasing solely Standard Hospital, ICU, or Birthing Beds from Linet and other competitors by the agreed-upon terms, commitment levels, and bundled discounts, either individually or in cumulative practical effect, incorporated in the contracts.

449.    Hillrom's use of exclusionary bundled discounts including monopoly products substantially lessens competition and/or tends to create a monopoly in the Relevant Markets.

450.    The anti-competitive effects of Hillrom's conduct far outweigh any purported pro-competitive justifications.  Similarly, there are no legitimate business justifications for Hillrom's

exclusionary conduct. To the extent that there are any legitimate business reasons for Hillrom's restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed pro-competitive business reasons for Hillrom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Relevant Markets.

451. Hillrom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving IDNs and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

452. As a direct, foreseeable, and proximate result of Hillrom's exclusionary, anti-competitive conduct, Linet has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

### COUNT VI
### Anti-Competitive Conduct
### in Violation of the Illinois Antitrust Act (740 ILCS 10/3)

453. Linet realleges paragraphs 1-405 as set forth above.

454. Hillrom engaged in anti-competitive conduct in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. §§ 10/1, et seq.

455. Specifically, by engaging in the anti-competitive behavior alleged above, Hillrom has entered contracts with one or more persons that unreasonably restrain trade or commerce in the Relevant Markets in violation of 740 ILCS 10/3(2).

456. Specifically, by engaging in the anti-competitive conduct alleged above, Hillrom willfully established, maintained, used, or attempted to acquire monopoly power over sales of the Relevant Products in the state of Illinois for the purpose of excluding competition or of controlling, fixing, or maintaining prices in each of the Relevant Markets, in violation of 740 ILCS 10/3(3).

457.     Hillrom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving IDNs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

458.     As a direct, foreseeable, and proximate result of Hillrom's exclusionary, anti-competitive conduct,, Linet has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

**COUNT VII**
**Unfair Methods of Competition and/or Unfair or Deceptive Acts or Pratcies**
**in Violation of the Illinois Consumer Fraud Act (815 ILCS 505/1)**

459.     Linet realleges paragraphs 1-405 as set forth above.

460.     Hillrom engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud Act ("ICFA"), 815 Ill. Comp. Stat. Ann. §§ 505/1, et seq.

461.     Specifically, Hillrom coerced hospital customers into agreements that prevent them from buying hospital bed products from Linet, threatened customers with price increases if they ceased buying from Hillrom, made misrepresentations of fact about Linet's products, made false statements about the interoperability of Hillrom's products with the products of other manufacturers including Linet, and engaged in other deceptive conduct as described in this Complaint.

462.     As a direct and proximate result of Hillrom's unfair, deceptive, and fraudulent conduct in violation of the ICFA, Linet was prevented from freely marketing or selling its hospital bed products to customers in the Relevant Markets.

463.     Linet suffered injury in fact and lost money as a result of Hillrom's unfair competition.  Hillrom's conduct has unreasonably restricted Linet's ability to fairly compete in the

Relevant Markets. Linet's standing, reputation, prestige, good will and business has been greatly damaged and shall in the future be damaged.

464. The ICFA mandates that it shall be both liberally construed and construed in consideration of the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a).

465. Hillrom's conduct has substantially lessened competition and resulted in power asymmetries that enable Hillrom's unlawful practices which hurt all Americans by raising the price of health care. This injury is of the type the ICFA and Sec. 5(a) of the FTC Act were designed to prevent and directly results from Hillrom's unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Linet respectfully requests that the Court adjudge and decree that:

- Hillrom engaged in unlawful acts in violation of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and/or Illinois law;

- Linet be awarded actual damages, including, without limitation, lost profits;

- Linet be awarded three-fold the damages (or the maximum amount of damages available under applicable law) that it is determined to have sustained pursuant to Section 4 of the Clayton Act;

- Linet be awarded punitive damages;

- Linet be awarded pre- and post-judgment interest on any actual, treble, and/or punitive damages award;

- Linet recover its costs of suit, including reasonable attorneys' fees and costs as provided by law;

- Hillrom be required to disgorge any profits gained by the illegal conduct;

- Hillrom be permanently enjoined from entering into any new corporate enterprise agreements with IDNs, and that it be enjoined from enforcing any of the exclusive dealing or bundling arrangements that it has entered into with any IDN or hospital.

- Hillrom be permanently enjoined from preventing non-Hillrom beds from connecting to its proprietary NaviCare nurse call system to the same extent that its own beds may connect, if the non-Hillrom bed is able to do so securely;

- Linet be granted prospective relief to promote competition and any other appropriate relief as may be determined to be just, equitable, and proper by this Court in light of Hillrom's recidivism and long history of antitrust violations; and

- Linet be granted any other appropriate relief as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:  December 28, 2021                    Respectfully submitted,


                                             */s/ Julie B. Porter*
                                             Julie B. Porter (#6243787)
                                             SALVATORE PRESCOTT PORTER &
                                             PORTER, PLLC
                                             1010 Davis Street
                                             Evanston, Illinois 60201
                                             (312) 283-5711
                                             porter@sppplaw.com

                                             Ryan P. Phair (#479050)
                                             Leslie Kostyshak (*pro hac vice forthcoming*)
                                             Christopher J. Dufek (*pro hac vice forthcoming*)
                                             Wm. Bennett Sooy (*pro hac vice forthcoming*)
                                             Kelly R. Oeltjenbruns (*pro hac vice forthcoming*)
                                             HUNTON ANDREWS KURTH LLP
                                             2200 Pennsylvania Avenue, NW
                                             Washington, D.C. 20037-1701
                                             (202) 955-1500
                                             rphair@hunton.com
                                             lkostyshak@hunton.com
                                             cdufek@hunton.com
                                             bsooy@hunton.com
                                             koeltjenbruns@hunton.com

                                             *Attorneys for Linet Americas, Inc.*

104